# Illinois Official Reports

## Appellate Court

---

### *People v. Flemming*, 2015 IL App (1st) 111925-B

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RON FLEMMING, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-1925 |
| Filed | May 1, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-5491; the Hon. Vincent M. Gaughan, Judge, presiding. |
| Judgment | Affirmed; remanded. |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Christopher L. Gehrke, all of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Amy M. Watroba, and Michele Lavin, Assistant State's Attorneys, of counsel), for the People. |

PRESIDING JUSTICE PALMER delivered the judgment of the court, with opinion.
Justices McBride and Reyes concurred in the judgment and opinion.


**OPINION**

¶ 1       Following a bench trial, the trial court found defendant Ron Flemming guilty of second degree murder and aggravated battery and sentenced him to 20 years' imprisonment. On appeal, defendant argues that the court erred in (1) finding him guilty of second degree murder where the State failed to disprove he acted in self-defense, (2) finding him guilty of aggravated battery and (3) failing to conduct an adequate inquiry regarding his *pro se* ineffective assistance claim.

¶ 2       In *People v. Flemming*, 2014 IL App (1st) 111925, filed August 15, 2014, we affirmed the convictions and remanded for sentencing on the aggravated battery conviction. On April 21, 2015, pursuant to Illinois Supreme Court supervisory order, we vacated our judgment in order to reconsider it in light of *People v. Jolly*, 2014 IL 117142, to determine whether a different result is warranted. *People v. Flemming*, No. 118371 (Ill. Jan. 28, 2015) (supervisory order). Upon reconsideration, we find that *Jolly* changes our original decision. We, therefore, affirm the convictions and remand for sentencing on the aggravated battery conviction and for a new preliminary *Krankel* (*People v. Krankel*, 102 Ill. 2d 181 (1984)) hearing, with directions.


¶ 3                                    BACKGROUND

¶ 4       The record shows that defendant was charged by grand jury indictment with four counts of first degree murder arising from the February 17, 2010, stabbing death of Steve Nabry. He was also charged with one count of attempted first degree murder and three counts of aggravated battery arising from the stabbing of Gerald Gushiniere on the same date. The State nol-prossed two of the first degree murder counts and the three aggravated battery counts.

¶ 5       At the bench trial, Gushiniere testified that he was currently in custody on a residential burglary charge. It was his understanding that, in exchange for his truthful testimony in defendant's case, the State's Attorney's office would recommend a three-year sentence on a reduced charge of burglary in his case. Gushiniere testified that he and his friend Nabry were walking to Nabry's house on February 17, 2010, to pick up a movie to watch at Gushiniere's apartment. They encountered defendant, whom Gushiniere knew "from the neighborhood," and a woman, subsequently identified as Yolanda McElroy. The four went to Gushiniere's studio apartment where Nabry, McElroy and defendant sat on the couch and smoked "crack." Gushiniere stated he sat on the bed drinking water. He denied telling defense counsel that he had been drinking alcohol.

¶ 6       Gushiniere testified that he was not smoking crack but at some point left with defendant "to get some more crack," leaving Nabry and McElroy at the apartment. Gushiniere stated it was light outside when he and defendant left the apartment to buy more crack. When defendant and Gushiniere returned "four or five minutes" later, they did not see Nabry and McElroy. Gushiniere testified that defendant knocked on the bathroom door, "busted in on them in the

bathroom" and Nabry and McElroy came out of the bathroom. Gushiniere did not know what McElroy and defendant were doing in the bathroom or whether they had their clothes on. He admitted that he never told police officers about going to pick up drugs with defendant and defendant "busting" on the bathroom door and rousting Nabry and McElroy.

¶ 7    Gushiniere testified that defendant, Nabry and McElroy "just went and got back on the couch" and started smoking crack again. When defendant and McElroy started arguing over her crack pipe, Gushiniere asked defendant to leave but defendant told him to "stay out of it." McElroy told him she did not feel safe with defendant so Gushiniere again asked defendant to leave. Defendant then "ran up on" Gushiniere with a knife he had pulled from his pocket and started cursing at him. Gushiniere testified defendant had pulled a folding knife from his pocket but admitted telling the grand jury that defendant had a different kind of knife, a knife "with multiples tools on it, a screwdriver with a file and you can bend it over and make tracks with it." Defendant held the knife by his side.

¶ 8    Gushiniere got a weight pole from the closet, defendant "grabbed the pole" from him and they began to wrestle over the pole. Gushiniere testified that he pushed defendant with the pole and managed to get him out of the apartment by swinging the pole at him to scare him. Defendant still had his knife. Gushiniere stated Nabry was not involved in ejecting defendant but admitted that he had made an earlier statement that Nabry had assisted in ejecting defendant. Outside the apartment, Gushiniere and defendant continued to fight over the pole and yelled at each other. Defendant still held his knife. Police officers approached the men. At the officers' direction, he left the pole and went back to his apartment. Gushiniere testified it was still light outside. He denied telling the officers that he had picked the pole up off the street to defend himself.

¶ 9    Gushiniere stated that, five minutes later, he, Nabry and McElroy were talking when a loud knock came at the door. He thought it was his mother because he had not "buzzed" anyone into the building and his mother was the only person with a key to the building. Gushiniere testified that he went unarmed to the door to let his mother in, even though she had her own key. Nabry was by his side. McElroy was still on the couch. He did not hear pounding or yelling.

¶ 10    Gushiniere testified that "[n]ext thing I know, I opened the door and he [defendant] stabbed Steve Nabry in the chest and I hopped in front." He testified that Nabry had approached the door before he opened it and neither he nor Nabry had anything in their hands. Gushiniere stated that when he opened the door, he saw defendant standing there holding a knife and saw defendant immediately stab Nabry in the chest. Gushiniere testified that he "hopped in front [of Nabry] and told [defendant] he can't stab Steve Nabry no more." Defendant then stabbed Gushiniere in the back and in his left arm. Gushiniere thought that defendant then pushed him onto Nabry. All three men fell onto the floor "at my house." Defendant kept stabbing Nabry.

¶ 11    Gushiniere stated he then picked up a weight and/or a weight pole (barbell) and started hitting defendant "in the head" and "in the face" with it. Gushiniere kept hitting defendant but defendant kept stabbing Nabry, who was trying to get up off the floor. Gushiniere stated that, when Nabry fell, Nabry had also "grab[bed]" a part of a weight pole with which to hit defendant. While still on the floor of the apartment, defendant stabbed Gushiniere in his back again. Gushiniere testified that, while in the apartment, defendant had stabbed him six times, in his right arm, left arm, shoulder and back.

¶ 12    Gushiniere testified variously that he pushed defendant toward the stairs, he and Nabry pushed defendant toward the stairs and Nabry did not help get defendant down the stairs.

Gushiniere saw McElroy coming out of the apartment when the three men were on the stairs. He chased defendant down the interior building stairs and out of the building. After Gushiniere had chased defendant outside, Nabry managed to get off the floor and come into the hallway of the building but fell there bleeding. He died before the police arrived. Gushiniere testified that he was taken to a hospital, where his wounds were "sewed up" and he stayed in "special care" for "one day" or "one night."

¶ 13    On cross-examination, Gushiniere explained that he originally told detectives that he did not know what drug defendant, Nabry and McElroy had been smoking because he did not learn until later the drug was crack. Gushiniere stated he was currently taking a medication named Risperdal, prescribed for him when he arrived at Cook County jail. Before that, "in the outside world," he had been taking Abilify, an anti-psychotic medication, which stopped him from seeing and hearing things that were not there. He had taken the Abilify regularly as he was supposed to.

¶ 14    Gushiniere stated that defendant had a knife in the hallway and ran out of the building still holding a knife. He did not know why there was a knife, shown in defense exhibit No. 3, inside his front door. He did not know whether the knife defendant brandished when the door opened was the same folding knife with which he had threatened Gushiniere earlier. He identified defense exhibit No. 3 as the knife defendant used to stab him and Nabry. Neither he nor Nabry had used the knife in defense exhibit No. 3.

¶ 15    The tool pictured in defense exhibit No. 5 was his own knife and had been lying on the floor of his apartment. Neither Nabry nor he used it against defendant. Gushiniere testified that the knife defendant had first pulled on him inside the apartment was a green pocket knife and defendant used the same knife when he came back to the apartment. He stated that neither he nor Nabry had a knife that evening. Gushiniere identified defense exhibit No. 7 as a photograph of the two parts of the weight pole with defendant's blood on them and a dumbbell. He stated that he and Nabry each held part of a weight pole and he also held the dumbbell but denied hitting defendant with the dumbbell. He identified a bottle of "Dom Julio" as alcohol he kept in his apartment as a souvenir.

¶ 16    Officer Torreno Cobb testified that, on February 17, 2010, at 11 p.m., he and two other officers were riding in an unmarked squad car. It was night and dark outside, but the area was well lit. The officers saw two men, one chasing the other with a pole in his hand, and stopped to speak to them. Cobb identified Gushiniere as the man running with the pole and defendant as the man being chased. He did not see Gushiniere actually swing the pole and saw no pushing and shoving. The officers took the five-pound pole away from Gushiniere and placed it in the squad car. They patted down defendant but found no weapons. It appeared to Cobb that defendant was under the influence "of maybe alcohol." Defendant was aggressive while Cobb was attempting to interview him and "yelling back and forth" to Gushiniere. Cobb told Gushiniere to go home and defendant to go home in the opposite direction and not return to Gushiniere's apartment. Cobb kept the pole in his custody but turned it over to detectives when he heard a stabbing had taken place. Cobb testified that Gushiniere told him he ran from defendant and picked the pole off the street to protect himself.

¶ 17    The parties stipulated that the medical examiner, Tara Jones, would testify that Nabry had stab wounds in the right upper and left side of his chest as well as abrasions, he died as a result of the multiple stab wounds and his death was a homicide. Toxicologist Peter Koin would testify that a toxicologic analysis of Nabry's blood showed it contained "a significant amount

of cocaine," a byproduct of cocaine named benzoylecgonine and morphine. Evidence technician William Buglio would testify that he processed the crime scene and inventoried, *inter alia*, blood samples found on the first, second and third floors, a 25-pound hand weight, a crack pipe, a 33-inch-long metal pipe with a suspected bloodstain, two other pipes with suspected bloodstains, a Leatherman pocket tool and a kitchen knife with a 5-inch blade. Jennifer Barrett and Christine Creagan of the Illinois State Police crime lab would testify that they found no fingerprints or presence of blood on the pocket tool. They lastly stipulated that Gushiniere's apartment was on the third floor.

¶ 18     Yolanda McElroy testified that on February 17, 2010, she was walking with defendant when they met Nabry and Gushiniere on the street. It was nighttime and dark. The four of them went to a third-floor apartment. McElroy stated that there was "stuff" on the floor but did not remember having to step over a dumbbell, knife or pocket tool to get into the apartment. She and defendant sat on the couch, Nabry sat on the bed and Gushiniere was in the back of the apartment. Everyone drank beer and defendant and Nabry smoked crack pipes. "Not long" thereafter, defendant told her that he had to leave for a few minutes "to go make a run."

¶ 19     Defendant left with Gushiniere, leaving her alone in the apartment with Nabry. She chatted with Nabry and then went to the bathroom. While she was in there, Nabry pushed the door open and came in. He asked her whether they could "hook up and get together." She told him no, because she was with defendant, and Nabry "was like okay, I can respect that." While they were still in the bathroom talking, defendant and Gushiniere returned to the apartment. Defendant pushed the bathroom door open, saying "what's going on in here, what are you doing." McElroy testified he "was upset."

¶ 20     McElroy left the bathroom, followed by Nabry, and defendant then went into the bathroom. She testified that, "when [defendant] came out of the bathroom he was even more angrier," was "yelling" at her and "appeared to be high." She could tell he was high because his eyes were glassy and "he was looking and, you know, like acting frantic." McElroy was sitting on the couch. Defendant approached, stood over her and "started arguing" with her, asking her "what did they give you, what did you do?" He started searching her pockets and lunged at her. Gushiniere "got in the middle" and told defendant to leave her alone. McElroy testified that Gushiniere and defendant then started a "pushing match." She saw defendant reach into his back pocket, pull out a black and gray switchblade knife and hold it at his side. When McElroy yelled his name and "no," defendant put the knife back in his pocket.

¶ 21     McElroy testified that, when defendant pulled out the knife, Gushiniere picked up a pole. After defendant put the knife back in his pocket, he and Gushiniere were wrestling, "tussling" back and forth, with Gushiniere telling defendant to leave and pushing defendant with the pole, trying to back him toward the door. McElroy stated that Nabry then started helping Gushiniere and together they were able to get defendant out of the apartment. Gushiniere also left the apartment, still holding the pole. McElroy watched through a window and saw Gushiniere and defendant go to a street corner. They were talking "kind of loud," arguing or discussing, she could hear their voices through the window. A police car pulled up. The police officers took the pole and Gushiniere returned to the apartment.

¶ 22     McElroy testified that she was upset and nervous and asked to borrow a phone so that she could have someone come and pick her up. She told Gushiniere that defendant "was upset right now" and she did not want to run into him. Nabry and Gushiniere told her defendant was gone

but she responded that "no, believe me, he's not gone." She had known defendant for three years and was dating him at the time.

¶ 23   Five minutes after Gushiniere returned, someone started banging on the apartment door. She had not heard the doorbell ring and no one had buzzed anyone into the apartment building. McElroy heard defendant's voice at the door, saying "yo, it's time to go, let the bitch out of there, come on out." She testified defendant kept banging and Nabry and Gushiniere decided to open the door. She stated one of them, she did not remember which one, picked up an "arm weight lift [dumb bell]" and the other picked up a weight pole. She did not know who opened the door.

¶ 24   McElroy testified that, "when the door opened, [defendant] charged at them." Gushiniere and Nabry were standing in the doorway and defendant "charged right into them, trying to get into the apartment." She stated she "didn't see anything in his hands." A fight ensued. McElroy stated she "[could not] say who did what as far as who hit who where and that kind of thing, but [defendant] charged at them. [Gushiniere] and [Nabry were] blocking the apartment way and they were fighting with him to try and get him backwards, to go back out the apartment door." They were using their hands to try to get defendant out and she did not see anyone hit him with the dumbbell.

¶ 25   McElroy testified that Gushiniere and Nabry prevented defendant from coming into the apartment by wrestling him "backwards" out into the hallway. She did not see them hit him with anything or him hit them with anything. She walked backwards further into the apartment away from them. Once the men were in the hallway, she heard "a lot of bumping noises, a lot of tussling and bumping, and you know, fighting noises." After a few minutes, she heard someone moaning "ahh, ooh, he stabbed me." After all was quiet and she heard the downstairs door closing, McElroy went into the hallway. She saw Nabry lying on his stomach surrounded by blood and Gushiniere on his knees, shirtless, with a wound in his back. She did not see any of the fight happening in the hallway because she did not go out into the hall until the fight was over.

¶ 26   On cross-examination, McElroy admitted that, although she told the grand jury that she did not have a case pending at the time of the grand jury hearing, she had actually been arrested for prostitution the day before the stabbing and had a court date pending when she went before the grand jury. She stated she had not lied to the grand jury because, although she had a court date, the case was ultimately dismissed. McElroy acknowledged that she took an antipsychotic medication named Seroquel as well as other medications for bipolar disorder. She knew she should not drink alcohol with the medications and had not taken her evening medication on the day of the incident because she was drinking. McElroy testified that she was not high or tipsy at the time of the stabbing and was not on her medication.

¶ 27   Defense counsel asked her why, in her statement to police officers, she did not tell them that defendant and Nabry were smoking crack. McElroy replied that she did not remember what she specifically told the State's Attorney or police officers regarding when the smoking started but that she did tell them about the crack and that the smoking did happen. She admitted she did not tell the officers that defendant had been "put out" of the apartment with a pole but that she should have. She admitted she did not tell them defendant had left earlier with Gushiniere, but she should have told them because "it happened."

¶ 28   McElroy stated that she was offered crack but politely refused it. She had used drugs in the past but had "been clean and sober" since she went into treatment on August 12, 2009. When

she had used drugs in the past, she and defendant would "party with people," have sex with other men. When Nabry followed her into the bathroom, he asked her about "partying or trying to get with" her, *i.e.*, sex, but did not offer her money or drugs for sex. She thought she had told the police officers about her conversation with Nabry in the bathroom, defendant's being angry about it, his going into the bathroom alone and coming out acting differently, "high and irate," and his arguing with her about what Nabry might have given her. McElroy admitted telling the grand jury that defendant lunged at her and Nabry got between them but, in fact, Gushiniere got between them. She stated she made the error because, at the time of the grand jury, she did not know Nabry's and Gushiniere's names and confused them. She had not reported to police that Gushiniere had intervened between her and defendant and started pushing defendant out of the apartment with a pole. She had not seen the knife shown in defense exhibit No. 3 or the utility knife shown in defense exhibit No. 5 that night. She stated that she had not been offered "any deals" in exchange for testifying in front of the grand jury.

¶ 29 Defendant testified that, on the evening of February 17, 2010, he and McElroy were on their way to dinner when they ran into Nabry and Gushiniere on the street. He subsequently testified that he and McElroy had been on their way to Nabry's house to see if they could get high. He had known Nabry for three years. Defendant acknowledged he had no money that night and was armed with a folding knife. He carried it for protection as he usually did in that neighborhood.

¶ 30 Defendant asked Nabry for cocaine, Nabry opened his mouth and showed him "a mouth full of cocaine" and the four went to Gushiniere's apartment. At the apartment, defendant smoked cocaine given to him by Gushiniere and a "rock" given to him by Nabry. He testified he was not high or agitated at the time. Nabry, meanwhile, had bagged up some cocaine, separating it with a knife. He asked defendant to go with Gushiniere to drop it off but defendant refused, telling him he did not "do that." Gushiniere left alone to deliver the package.

¶ 31 Defendant testified that, at some later point, Nabry asked him whether McElroy "freaked off." Defendant replied that it was up to McElroy. Nabry then gave McElroy some cocaine, she smoked it and performed oral sex with Nabry on the bed. Defendant was sitting on the couch. McElroy took off her clothes and handed them to defendant. He denied that McElroy performed oral sex in exchange for drugs, stating that he and McElroy were "swinging." Gushiniere returned.

¶ 32 Nabry and McElroy then went into the bathroom. Defendant knocked on the door and they came out. Defendant testified that there was no argument. He merely asked Nabry what was going on because, when he and McElroy partied, "having sex, two men and one lady," they did not separate and it was strange that Nabry took her into the bathroom alone. Defendant stated that, when Nabry and McElroy went into the bathroom, it did not make him uncomfortable and did not bother him. He did not like it that his girlfriend went into the bathroom alone with Nabry and was whispering with Nabry but he just told Nabry that "we started together, we'll finish together." At that point, he, Nabry and McElroy had their clothes off. When he undressed, defendant had taken his knife from his pocket and put it on the table.

¶ 33 Subsequently, defendant and Gushiniere left the apartment to get more cocaine. Although the neighborhood was dangerous, defendant left his knife in the apartment because he was with Gushiniere. After he returned to the apartment with Gushiniere, he did not smoke any more. McElroy was sitting on the couch and Nabry was standing by the bed. McElroy had her clothes on but Nabry only had his shirt on. Defendant told McElroy he was ready to go and she

responded that she had smoothed everything over. Nabry then mentioned $20, and defendant assumed Nabry had given McElroy drugs that defendant now had to pay for. He and McElroy put on their coats and got ready to leave. Nabry and Gushiniere then started arguing with defendant over whether McElroy should stay or go. When Gushiniere reached for a "Patron bottle," defendant picked up his folding knife from the table and put it into his back pocket because he was leaving. He testified that he felt threatened because Gushiniere was reaching for the bottle. Gushiniere put the bottle back down when defendant told him he was leaving.

¶ 34　　Defendant testified that he walked out of the apartment on his own and Gushiniere closed the door. However, by the time defendant got downstairs, Gushiniere was coming down the stairs with a 30-inch pipe in his hands. Gushiniere waved the pipe and walked him to the corner, where they started talking, not yelling. Defendant started to walk down the street with Gushiniere walking behind him, at which point police officers stopped the men. They patted defendant down. He had brought his knife out of the apartment but had threw it "to the side" when he saw the police officers. Defendant testified that he had felt threatened when Gushiniere picked up the bottle but not when Gushiniere had the pole.

¶ 35　　Defendant testified that Gushiniere returned to his apartment and he started to go to a friend's house. He then remembered that McElroy's mother had told him McElroy was his responsibility and went back to Gushiniere's apartment for her. Defendant stated he was unarmed and did not pick his knife back up because he did not know where he threw it. He admitted that he told detectives that he returned to the apartment to pick up some paperwork but stated he also told them that he went there to retrieve McElroy.

¶ 36　　On cross-examination, however, defendant stated that, after the incident with Nabry, he had left the apartment on his own because the situation was getting out of hand and that he had waited for McElroy to come out but instead Gushiniere came out. He talked to Gushiniere on the corner about McElroy and Gushiniere had returned to the apartment to ask McElroy what she was going to do. Defendant admitted that he had told detectives that he had told McElroy to stay at the apartment if she wanted and that he'd be back but denied that he had not been waiting for her to come out.

¶ 37　　Defendant further testified on direct examination that, back at the apartment building, he "buzzed" Gushiniere's doorbell, McElroy came on the intercom, she told him she would be down and "they" then buzzed him into the building. He waited for a while downstairs but, when McElroy did not come down, he went upstairs and knocked on the door. Asked to identify himself, he gave his name. He heard Gushiniere come to the door and Nabry tell Gushiniere not to open it. The door was then opened.

¶ 38　　Defendant stated that Nabry and Gushiniere were standing in the doorway "with pipes and a dumbbell." He felt threatened because they had weapons. Defendant stepped back and said, "you know, hey, man it's not that serious." He then ran up the stairs from Gushiniere's apartment to the fourth floor landing. Nabry put the dumbbell down, Gushiniere handed Nabry a pipe and Nabry pulled a folding knife out of his pocket, saying "I know you like knives." Nabry did not have the knife in his hands when the door opened but pulled it out of his pocket when defendant was on stairs.

¶ 39　　Defendant testified that, when he stepped up some more stairs, Nabry hit him in the leg with the pipe, stepped to the side and swung at his head. Defendant blocked the blow with his arm and "grabbed" Nabry's arm. Someone hit defendant in the head, he fell forward and then all three men fell. Defendant is blind in one eye and his glasses fell off during the struggle.

¶ 40    Defendant testified that, when he fell, Nabry dropped the knife. He and Nabry scrambled for the knife and defendant "grabbed it." He denied telling detectives that he had taken the knife from Nabry's hand. Nabry started "swinging" at defendant, hit him in the head, and defendant started swinging the knife. He could not see what he was doing and did not know how many times he stabbed. Defendant testified that, when he picked the knife up off the floor and swung it, he was "trying to get them off of me" because he thought they were going to kill him.

¶ 41    When Gushiniere and Nabry got off defendant, he stood up, started to run down the stairs and fell to the first floor. Nabry was behind him, swinging at him with a pole as he fell down the stairs. Gushiniere was upstairs. As defendant got out of the front door, he saw Nabry go back up the stairs. Defendant then called the police because he was hurt and knew Gushiniere and Nabry were hurt. Defendant was taken to the hospital, where he received stitches and a "technic" shot.

¶ 42    Defendant stated that, after the stabbings, he did not take the knife outside so must have dropped it going down the stairs. He stated that he had not used the knives pictured in defense exhibits Nos. 3 and 5 to stab Nabry and Gushiniere and had not seen Nabry or Gushiniere with either knife. However, he identified the knife pictured on defense exhibit No. 3 as the knife used by Nabry to separate out the cocaine that night. He did not know how the knife came to be at the front door. He had not seen the utility tool pictured in defense exhibit No. 5 that night. He identified the weight in defense exhibit 6 as having hit him that night but he did not know who wielded it.

¶ 43    The parties stipulated that Detective Parks would testify that the upshot of McElroy's statement to him was that defendant, McElroy, Nabry and Gushiniere were drinking beer in the apartment, defendant went to the bathroom for several minutes and returned acting different, he appeared high and irate and he walked toward her and asked "what did he give you, don't lie to me." He stated McElroy did not tell him that Gushiniere had ejected defendant from the apartment with a pole, Gushiniere and defendant had left the apartment to buy drugs or defendant had come into the bathroom with her and Nabry. The parties also stipulated that Detective Barsh would testify that defendant told him during an interview that "I grabbed his [Nabry's] hand, the knife then."

¶ 44    The trial court found defendant guilty of two counts of second degree murder for Nabry's death and one count of aggravated battery of Gushiniere. It noted that it had observed the demeanor of the witnesses and was aware of defense counsel's "perfect impeachment" and the inconsistencies in the evidence, including the fact that Gushiniere testified the 11 p.m. incident occurred in daylight when sunset had occurred at 5:26 p.m. that night. The court denied defendant's posttrial motion.

¶ 45    During the sentencing hearing, defendant made an oral *pro se* motion for a new trial asserting ineffective assistance of counsel. Noting that the law required an informal hearing "at this stage," the court asked defendant to restate his claim. Defendant stated that his counsel was ineffective because she had told him Gushiniere was stabbed three times when in fact Gushiniere had been stabbed six times and she had failed to bring out at trial that Nabry had an extensive background of unprovoked aggression. He also claimed it should have been "on the record" that McElroy had stated that he did not have anything in his hand when he returned to the apartment, that she had stated that everyone had been drinking and that the evidence showed Nabry had no alcohol in his system.

¶ 46    The court then asked the State to examine defense counsel. The State asked defense counsel seven questions. It elicited counsel's testimony that she had discussed Gushiniere's medical records, including the number of stab wounds Gushiniere received, with defendant. Counsel also testified that she had participated in a conference with the court and the State regarding Nabry's criminal history and that it was her trial strategy to keep Nabry's criminal history from the trier of fact.

¶ 47    The court then denied defendant's motion for a new trial predicated on ineffective assistance of counsel. It found defense counsel's testimony "more credible" and, "[a]s far as the other material concerning the behavior and background concerning aggressiveness, I find that was a legitimate trial strategy." The court merged the two second degree murder counts and sentenced defendant to 20 years' imprisonment. It stated that it was not entering judgment on the aggravated battery conviction. On June 9, 2011, the court denied defendant's motion to reconsider his sentence. Defendant filed a timely notice of appeal on June 10, 2011.

¶ 48                                    ANALYSIS

¶ 49    Defendant raises the following three arguments on appeal: the court erred in (1) finding him guilty of second degree murder where the State failed to disprove he acted in self-defense, (2) finding him guilty of aggravated battery and (3) failing to conduct an adequate inquiry regarding his *pro se* ineffective assistance claim.

¶ 50                         1. Second Degree Murder Conviction

¶ 51    Defendant first challenges the sufficiency of the evidence to sustain his conviction for second degree murder. He argues that the court erred in finding him guilty of second degree murder because the State failed to disprove that he acted in self-defense beyond a reasonable doubt and its entire case rested on the inconsistent and contradictory testimony of two inherently incredible witnesses, Gushiniere and McElroy.

¶ 52    In considering a challenge to the sufficiency of the evidence, the reviewing court must determine whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). The trier of fact, here the trial court, is responsible for assessing the credibility of the witnesses, weighing the testimony, and drawing reasonable inferences from the evidence. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001). We will not reverse a criminal conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt as to the defendant's guilt. *People v. Cox*, 195 Ill. 2d 378, 387 (2001).

¶ 53    Defendant was charged with two counts of first degree murder of Nabry under sections 9-1(a)(1) and (a)(2) of the Criminal Code of 1961 (Code) (720 ILCS 5/9-1(a)(1), (a)(2) (West 2010)) but found guilty of second degree murder on both counts. Pursuant to sections 9-1(a)(1) and (a)(2), first degree murder occurs when a person kills another person without lawful justification and, in performing the acts which cause the death, he (1) either intended to kill or do great bodily harm to that individual or another or knew that such acts will cause death to that individual or another or (2) knew that such acts create a strong probability of death or great bodily harm to that individual or another. 720 ILCS 5/9-1(a)(1), (a)(2) (West 2010). The elements of first and second degree murder are identical. *People v. Jeffries*, 164 Ill. 2d 104, 122

(1995). Second degree murder differs from first degree murder only in the presence of a mitigating factor, such as an alleged provocation or an unreasonable belief in justification. *People v. Porter*, 168 Ill. 2d 201, 213 (1995).

¶ 54 At trial, the State argued that defendant returned to the apartment with a knife to retaliate against Nabry and Gushiniere. Defendant argued that he went back to the apartment unarmed to retrieve McElroy, not to retaliate. He also argued that, even if the State met its burden to prove murder, it did not disprove self-defense beyond a reasonable doubt. Self-defense is a recognized legal justification to first degree murder.[1] *Jeffries*, 164 Ill. 2d at 127. Once defendant raised this affirmative defense, the State had the burden to prove beyond a reasonable doubt not only the elements of first degree murder but also that the murder was not carried out in self-defense. *Id*. In order to raise self-defense:

> "[T]he defendant must establish some evidence of each of the following elements: (1) force was threatened against a person; (2) the person threatened is not the aggressor; (3) the danger of harm was imminent; (4) the threatened force was unlawful; (5) he actually and subjectively believed a danger existed which required the use of the force applied; and (6) his beliefs were objectively reasonable." *Id.* at 127-28.

If the State negates any one of these elements, a defendant's claim of self-defense fails. *Id*. at 128.

¶ 55 Only if the State has successfully proven the elements of first degree murder and negated a defendant's claim of self-defense may the trier of fact consider whether the defendant is guilty of first degree murder or second degree murder. *Id*. at 128-29. In order to be found guilty of second degree murder rather than first degree murder, a defendant must prove by a preponderance of the evidence that:

> "(1) at the time of the killing he or she is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed; or
>
> (2) at the time of the killing he or she believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his or her belief is unreasonable." 720 ILCS 5/9-2(a)(1), (a)(2) (West 2010).

Given that the court found defendant guilty of second degree murder, it necessarily must have found that the State proved the elements of first degree murder, the State disproved or defendant failed to raise at least one of the elements of self-defense and defendant proved by a preponderance of the evidence a mitigating factor sufficient to reduce the offense from first degree murder to second degree murder. *Jeffries*, 164 Ill. 2d at 129.

---

[1]"A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony." 720 ILCS 5/7-1 (West 1996).

¶ 56    Defendant challenges the State's assertion that he did not act in self-defense. He argues the State's case was so unsatisfactory, improbable and unreasonable that it established a reasonable doubt as to his guilt, asserting that the State's case was predicated exclusively on the testimony of two inherently incredible witnesses, Gushiniere and McElroy, who directly contradicted each other and themselves on nearly every relevant fact in the case regarding the details of the fight that caused Nabry's death.

¶ 57    The trial court was presented with conflicting versions of defendant's reentry into the apartment and subsequent stabbing of Nabry. The State's version, presented through the testimony of Gushiniere and McElroy, was that defendant approached the door armed with a knife and, when the door opened, he immediately attacked Gushiniere and Nabry and stabbed Nabry without provocation or legal justification. Defendant's version, presented through his own testimony, was that he approached the door unarmed, Gushiniere and Nabry were armed with poles when they opened the door and, although he verbally tried to defuse the situation and run upstairs, Nabry attacked him and he wound up stabbing Nabry in self-defense with Nabry's own knife.

¶ 58    When presented with conflicting versions of events from witnesses, it is the trial court's responsibility to determine the credibility of those witnesses and to determine which version to believe. *People v. Villarreal*, 198 Ill. 2d 209, 231 (2001). Here, the court chose to believe the version presented by the State through the testimony of eyewitnesses Gushiniere and McElroy and did not believe defendant's version of events. Gushiniere's and McElroy's testimony established that defendant attacked Nabry without provocation as soon as the door opened. Neither testified that Nabry and/or Gushiniere attacked or threatened defendant first such that he would need to immediately stab Nabry to protect himself.

> "In the context of self-defense, it is the defendant's perception of the danger, and not the actual danger, which is dispositive. *** Nevertheless, *** in cases of self-defense, the issue *** is whether the facts and circumstances induced a reasonable belief that the threatened danger, whether real or apparent, existed. The reasonableness of a defendant's subjective belief that he was justified in using deadly force is a question of fact for the [trier of fact] to determine." *People v. Sawyer*, 115 Ill. 2d 184, 193 (1986).

Accepting Gushiniere's and McElroy's version of the events, and viewing the evidence in a light most favorable to the State, a rational trier of fact could find that the State disproved beyond a reasonable doubt that any belief on defendant's part that he was justified in using deadly force was reasonable.

¶ 59    There is no question that Gushiniere and McElroy contradicted each other throughout their testimony. They did not agree on who sat where in the apartment, who was drinking alcohol, who was smoking crack or how the argument between McElroy and defendant arose. They did not agree on whether Gushiniere chased defendant outside, whether Gushiniere and defendant argued outside, whether defendant knocked/banged on the door and yelled when he returned to the apartment, whether Gushiniere and/or Nabry were holding poles or weights when they opened the door and a myriad of other details.

¶ 60    They did, however, agree that defendant was agitated, aggressive and argumentative and possibly high while in the apartment the first time. This testimony was corroborated by Officer Cobb, who testified that defendant was aggressive and appeared under the influence of something when he questioned him outside, shortly before the stabbing. Gushiniere and McElroy also agreed that defendant refused to leave the apartment and had to be forced out by

Gushiniere, that he returned to the apartment shortly after his conversation with the officers and, when Gushiniere opened the door to him, he immediately attacked. Gushiniere testified that, when he opened the door, defendant was holding a knife and immediately stabbed Nabry while McElroy testified that defendant immediately charged Nabry and Gushiniere and she did not see anything in defendant's hands. However, they both agree that defendant was the aggressor; that he immediately attacked. The fact that McElroy did not see anything in defendant's hands does not mean that he was not holding a knife.

¶ 61    Defendant points out that Gushiniere and McElroy contradicted not only each other but themselves throughout their testimony. As the trial court noted, defense counsel was able to impeach both Gushiniere and McElroy with statements each had previously made to police officers and the grand jury. But none of these inconsistencies related to the crux of the question here, whether defendant immediately stabbed Nabry and/or attacked Gushiniere and Nabry when the door opened and, if so, whether he was justified in doing so, *i.e.*, whether defendant could have reasonably believed that deadly force was necessary in the situation.

¶ 62    Moreover, even if part of a witness's testimony is questionable, this does not necessarily mean that everything that the witness said on the stand must be subject to question. *People v. Cunningham*, 212 Ill. 2d 274, 282-83 (2004). A fact finder may reject entire testimony but is not bound to do so. *Id*. at 283. " '[C]ontradictory testimony of a witness does not per se destroy [his credibility], and it remains for the trier of fact to decide when, if at all, he testified truthfully.' " *Id*. (quoting *Sparling v. Peabody Coal Co.*, 59 Ill. 2d 491, 498-99 (1974)). "In other words, it is for the fact finder to judge how flaws in part of the testimony affect the credibility of the whole." *Id.* Nothing in the record supports finding that the court erred in crediting portions of Gushiniere and McElroy's testimony over defendant's testimony.

¶ 63    Defendant also argues that Gushiniere and McElroy were unreliable witnesses because they were both on psychotropic medications. The mental health of a witness can be relevant to assessing a witnesses' credibility. *People v. Williams*, 147 Ill. 2d 173, 237 (1991). Here, however, beyond Gushiniere's and McElroy's testimony regarding the medications they were taking, the evidence did not otherwise call into question their ability to observe the situation clearly and communicate it accurately and truthfully.

¶ 64    Viewed in the light most favorable to the State, we find that the evidence presented at trial supports finding beyond a reasonable doubt that defendant stabbed Nabry without lawful justification, intending to kill or cause great bodily harm to Nabry and knowing that his act created a strong probability of death or great bodily harm. Further, the testimony supports finding that defendant was the aggressor in the situation and that any subjective belief he may have had that he was justified in using deadly force as self-defense was unreasonable. Accordingly, the evidence supports a finding that defendant did not prove he stabbed Nabry in self-defense.

¶ 65    Defendant asserts that the court's second degree murder conviction represented a rejection of Gushiniere's account of the fight that resulted in Nabry's death. Gushiniere had testified that, when he opened the door, defendant immediately stabbed Nabry in the chest. Defendant asserts that no reasonable fact finder could find this version of the fight compatible with imperfect self-defense, mutual combat or any other theory of second degree murder, *i.e.*, if the court believed Gushiniere, it would have found defendant guilty of first degree murder. Not so. If the court believed defendant had an unreasonable belief in self-defense when he stabbed

Nabry without legal justification, then the evidence supports a second degree murder conviction. *People v. Hawkins*, 296 Ill. App. 3d 830, 836 (1998).

¶ 66  As noted above, after viewing the evidence in a light most favorable to the State, a rational trier of fact could find the evidence supports finding that defendant's belief that the circumstances justified using self-defense against Nabry was unreasonable. Accordingly, the State proved first degree murder and disproved self-defense beyond a reasonable doubt. Defendant did, however, prove one of the mitigating factors for second degree murder and the court, therefore, did not err in finding defendant guilty of the second degree murder of Nabry. Defendant does not challenge his sentence. We affirm the conviction and sentence.

¶ 67                                2. Aggravated Battery Conviction

¶ 68  Defendant argues the court erred in finding him guilty of aggravated battery of Gushiniere because the State failed to (a) prove that Gushiniere suffered great bodily harm beyond a reasonable doubt and (b) disprove self-defense. He also argues that aggravated battery is not a lesser-included offense of attempt murder as charged.

¶ 69  Defendant was charged with attempt first degree murder of Gushiniere and found guilty of aggravated battery. He raised self-defense as an affirmative defense. The State, therefore, had the burden to prove beyond a reasonable doubt not only the elements of the charged offense but also that defendant did not act in self-defense. *Jeffries*, 164 Ill. 2d at 127. The self-defense argument has been adequately addressed in section 1 above. Suffice it to say, after viewing the evidence in a light most favorable to the State, a rational trier of fact could find the evidence supports finding beyond a reasonable doubt that defendant was the aggressor, no force was threatened against him, danger of harm was not imminent and his belief that the circumstances justified using self-defense was not reasonable.

¶ 70  The court did not specify the type of aggravated battery it found defendant committed and stated no findings of fact from which this can be gleaned. Defendant asserts that "it can be presumed" that the court was referring to "simple" aggravated battery predicated upon "great bodily harm, or permanent disability or disfigurement" (hereinafter great bodily harm) as set forth in section (a)(1) of the aggravated battery statute (720 ILCS 5/12-4(a)(1) (West 2010)).[2] He argues that the State failed to prove Gushiniere suffered "great bodily harm" beyond a reasonable doubt because McElroy's testimony that she saw a wound on Gushiniere's back and Gushiniere's testimony that he was stabbed six times and taken to the hospital where he was "sewed up" and stayed for either "one night" or "one day" are insufficient to establish that the wounds were so serious as to constitute great bodily harm. Whether a victim's injuries rise to the level of great bodily harm is a question for the trier of fact. *People v. Cochran*, 178 Ill. App. 3d 728, 738 (1989). Viewing this evidence in the light most favorable to the State, we conclude that a rational trier of fact could find that Gushiniere suffered great bodily harm. Gushiniere's testimony shows that his injuries were severe enough to warrant medical treatment. These were not superficial injuries. Superficial wounds do not require stitches or an

---

[2]The aggravated battery statute in effect at the time of the offense, section 12-4 of the Code (720 ILCS 5/12-4 (West 2010)), was renumbered and amended as section 12-3.05 of the Code (720 ILCS 5/12-3.05 (West 2012)), effective July 1, 2011. Pub. Act 96-1551, art. 1, § 5 (eff. July 1, 2011). The State cites to the renumbered statute throughout.

in-hospital observation period. Gushiniere's testimony is sufficient to show defendant inflicted great bodily harm on him.

¶ 71    Moreover, we see no reason to presume that the court found defendant guilty under subsection (a)(1) of the aggravated battery statute when the evidence also supports finding him guilty of aggravated battery under subsection (b)(1) of the statute (720 ILCS 5/12-4(b)(1) (West 2010)), which is predicated on use of "a deadly weapon other than by the discharge of a firearm" (720 ILCS 5/12-4(b)(1) (West 2010)) and has no "great bodily harm" component. There is no question that the knife defendant used to stab Gushiniere and cause him physical harm was a deadly weapon. A deadly weapon is an "instrument that is used or may be used for the purpose of an offense and is capable of producing death." *People v. Blanks*, 361 Ill. App. 3d 400, 411 (2005). The knife with which defendant stabbed Gushiniere and caused his injuries is the same knife with which defendant stabbed and killed Nabry. The knife was not just "capable of producing death." It had produced death. Accordingly, the evidence supports finding defendant committed battery on Gushiniere with a deadly weapon and, therefore, is guilty of aggravated battery under subsection (b)(1) of the Code.[3]

¶ 72    Defendant argues that he should not have been convicted of aggravated battery because he was charged with attempted first degree murder, not aggravated battery, and aggravated battery is not a lesser-included offense of attempted murder. The indictment charged defendant with committing attempted first degree murder "in that he, without lawful justification, with intent to kill, did any act, to wit: stabbed Gerald Gushiniere with a knife, which constituted a substantial step towards the commission of first degree murder." Defendant claims that, because the indictment does not describe Gushiniere's actual injuries, it is insufficient to show that great bodily harm occurred and, therefore, insufficient to encompass aggravated battery as a lesser-included offense of attempted murder as charged in this case.

¶ 73    Defendant did not raise this argument in his posttrial motion to the trial court. A defendant's failure to both object at trial to an alleged error and raise the issue in a written posttrial motion results in forfeiture of that issue on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defendant requests, however, that we review the nonpreserved allegation of error under the plain error doctrine. Under this doctrine, we may consider a nonpreserved error "where the evidence is closely balanced or the error was so fundamental and of such magnitude as to deny the defendant a fair trial." *People v. Macri*, 185 Ill. 2d 1, 40 (1998). Or, put another way, when "(1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). However, before considering plain error, we must first determine whether error occurred at all. *People v. Harris*, 225 Ill. 2d 1, 31 (2007). The defendant bears the burden of persuasion in plain error review. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). If the defendant fails to sustain his burden, we must honor the procedural default. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). For the reasons that follow, there was no error here.

---

[3]There is no question that the defendant committed a battery against Gushiniere. "A person commits battery if he or she knowingly without legal justification by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a) (West 2010). As discussed in section 1 above, defendant had no legal justification for knowingly attacking Gushiniere with a knife and physically harming him.

- 15 -

¶ 74    We apply the charging instrument approach when determining whether an uncharged offense is a lesser-included offense of a charged offense. *People v. Kennebrew*, 2013 IL 113998, ¶ 32. Under this approach, "the lesser offense need not be a 'necessary' part of the greater offense, but the facts alleged in the charging instrument must contain a 'broad foundation' or 'main outline' of the lesser offense." *Id*. ¶ 30 (quoting *People v. Miller*, 238 Ill. 2d 161, 166 (2010), citing *People v. Kolton*, 219 Ill. 2d 353, 361 (2006), and *People v. Novak*, 163 Ill. 2d 93, 107 (1994)). " 'The indictment need not explicitly state all of the elements of the lesser offense as long as any missing element can be reasonably inferred from the indictment allegations.' " *Id*. (quoting *Miller*, 238 Ill. 2d at 166-67).

¶ 75    As noted above, with regard to Gushiniere, the indictment charged defendant with committing attempted first degree murder "in that he, without lawful justification, with intent to kill, did any act, to wit: stabbed Gerald Gushiniere with a knife, which constituted a substantial step towards the commission of first degree murder." We find that merely stating that Gushiniere was stabbed is insufficient to satisfy the requirement that the element of great bodily harm can be reasonably inferred. The term "stabbed" can denote many levels of the infliction of injury. For example, a superficial wound can also be described as a stab wound.

¶ 76    However, as noted previously, the evidence here supported not only a finding that defendant committed aggravated battery predicated on great bodily harm under subsection (a)(1) but also a finding that he committed aggravated battery under subsection (b)(1) of the statute for knowingly and without legal justification causing bodily harm to Gushiniere or making physical contact of an insulting or provoking nature with him using a deadly weapon other than a firearm. The indictment is clearly sufficient to provide a main outline of the latter offense. From the charge that defendant "stabbed *** Gushiniere with a knife" intending to kill him, one can readily infer that defendant made the requisite physical contact of an insulting or provoking nature with Gushiniere using a deadly weapon other than a firearm, sufficient to notify defendant that aggravated battery under subsection (b)(1) was a lesser-included offense of attempted murder. We may affirm on any basis in the record. *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 37.

¶ 77    Given our finding that aggravated battery under subsection (b)(1) was a lesser-included offense of attempted murder under the indictment here, the court did not err in finding defendant guilty of committing aggravated battery on Gushiniere. Consequently, given that no error occurred, we find no plain error and no basis to excuse defendant's procedural default of this argument. *People v. Chapman*, 194 Ill. 2d 186, 227 (2000).

¶ 78    For the foregoing reasons, the court did not err in finding defendant guilty of committing aggravated battery on Gushiniere. Although the court found defendant guilty of aggravated battery, it did not enter judgment on the conviction. The appellate court has the authority to remand for entry of sentence. *People v. Scott*, 69 Ill. 2d 85, 88 (1977). We remand for entry of judgment and sentencing on the aggravated battery conviction under subsection (b)(1) of the aggravated battery statute (720 ILCS 5/12-4(b)(1) (West 2010)).

¶ 79                    3. *Pro Se* Ineffective Assistance of Counsel Claim

¶ 80    Defendant argues that, in violation of *People v. Krankel*, 102 Ill. 2d 181 (1984), the court failed to conduct an appropriate judicial inquiry and hearing regarding his *pro se* claim that trial counsel was ineffective. He asserts that the court failed to conduct the requisite initial judicial inquiry, "one-on-one style" with defendant and defense counsel, and, instead,

"conducted a full-blown hearing wherein the prosecutor conducted an examination of defense counsel" but defendant was not represented by new counsel and was denied the opportunity to cross-examine defense counsel, to present evidence and to argue defense counsel's ineffectiveness.

¶ 81    In *Krankel*, our supreme court found that the failure to appoint new counsel to argue a defendant's *pro se* posttrial motion alleging ineffective assistance of counsel was error and remanded the cause for a new hearing on the ineffective assistance of counsel claim. *Krankel*, 102 Ill. 2d at 189. Subsequent cases interpreting *Krankel* compel a fairly narrow reading of the case. In *People v. Nitz*, 143 Ill. 2d 82 (1991), our supreme court clarified that there is no *per se* rule that new counsel must be appointed every time a defendant presents a *pro se* motion for a new trial alleging ineffective assistance of counsel. *Id.* at 134. Rather, the trial court should first examine the factual matters underlying the defendant's claim to determine whether new counsel should be appointed. *Id.*

¶ 82    In considering this initial inquiry, "[t]he operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *People v. Moore*, 207 Ill. 2d 68, 78 (2003). If the court determines that the claim lacks merit or pertains only to matters of trial strategy, then it need not appoint new counsel and may deny the *pro se* motion. *Id.* If, however, the court finds that the allegations show possible neglect of the case, the case then proceeds to the second step of a *Krankel* hearing, an adversarial proceeding in which new counsel must be appointed to represent the defendant on his *pro se* claim of ineffective assistance. *Id.* We review the manner in which the trial court conducted its *Krankel* hearing *de novo*. *Id.* at 75.

¶ 83    Defendant argues that the trial court here compressed the two steps and, thereby, failed to properly execute either of them. He asserts the court failed to engage in an elemental one-on-one inquiry with defendant and defense counsel and, instead, held a full-blown hearing where defense counsel testified for the State against her client and defendant was not represented by new counsel to protect his interests. The entire colloquy addressing defendant's *pro se* ineffective assistance of counsel claims was as follows:

"THE COURT: Mr. Fleming has made a motion, a pro se motion in the nature of a new trial based on ineffective assistance of counsel. Because it's at this stage, case law says that I can hold an informal hearing on this.

Mr. Fleming, would you restate why you believe your attorney was ineffective as your counsel?

THE DEFENDANT: Well, at trial it wasn't mentioned that Steve Nabry has extensive background, unprovoked aggression. At trial, when it said that I stabbed Gerald six times, and I was under the impression that it was three times. That Yolanda McElroy said when I came back that I didn't have anything in my hand, and also said that everybody in there drinking, and Steve didn't have any alcohol in his system. So I'm looking at it should have been on the record.

THE COURT: All right. Thank you. State, you can examine counsel. Miss Smith, state your name for the record, please.

MS. SMITH [defense attorney]: Susan Smith.

THE COURT: And you're the attorney that represented and is in the process of representing Mr. Fleming; is that correct?

MS. SMITH: Yes, your honor.

THE COURT: All right. State.

MS. LANIER [Assistant State's Attorney]: Miss Smith, during your representation *** of the defendant, did you discuss with him Mr. Gushiniere's medical records?

MS. SMITH: Yes, I did.

MS. LANIER: Did you actually go over these medical records with him?

MS. SMITH: Yes, I did.

MS. LANIER: And that would have included any injuries and treatment he received; is that correct?

MS. SMITH: Yes.

MS. LANIER: In addition, on March 15–

THE COURT: I'm sorry, but that doesn't get to the number.

MS. LANIER: Included in those records were the number of stab wounds Mr. Gushiniere received, as well as the treatment for this stab wounds; is that correct?

MS. SMITH: Yes.

MS. LANIER: On March 15 of 2011 did you participate in a conference with Judge Gaughan, along with myself, regarding this case?

MS. SMITH: Yes, I did.

MS. LANIER: During the conference, did we discuss the victim, Mr. Nabry's criminal history in this case?

MS. SMITH: Yes, we did.

MS. LANIER: And during the trial was it then based on the results of that conference, trial strategy to not put that before the trier of fact?

MS. SMITH: Yes.

THE COURT: Thank you. All right. As to the allegations–first of all, I'm not entering judgment on Count 5, which is the aggravated battery charge.

As to the allegations as to the number of stab wounds, I find that Miss Smith's testimony is more credible. As far as the other material concerning the behavior and background concerning aggressiveness, I find that was a legitimate trial strategy.

Mr. Flemming, the motion for new trial predicated on ineffective assistance of counsel is denied."

¶ 84    Contrary to defendant's assertions, the State's questioning of defendant was not a "full-blown" second-stage hearing. The record shows that the questioning was conducted at the court's direction and was very brief, consisting of only seven questions. The questions were specifically directed to determining whether defense counsel informed defendant regarding the number of stab wounds and why she did not raise the issue of Nabry's previous aggression before the court. The questioning was clearly a preliminary inquiry, intended to provide the court with information regarding the factual matters underlying defendant's claims in order to determine whether the claims had merit and should be examined further, in which case new counsel should be appointed for defendant.

¶ 85    The fact that the State rather than the court asked the questions of defense counsel, that the court did not personally engage in an interchange with defense counsel, makes no difference in

our determination that the hearing was a preliminary *Krankel* hearing. There is no set format for how an initial inquiry into a defendant's *pro se* allegations of ineffective assistance of counsel should be conducted. During an initial inquiry:

> "[S]ome interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim. Trial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations. [Citations.] A brief discussion between the trial court and the defendant may be sufficient. [Citations.] Also, the trial court can base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 78-79.

In other words, a trial court's method of inquiry at a *Krankel* hearing is somewhat flexible. *People v. Fields*, 2013 IL App (2d) 120945, ¶ 40. Although a court may conduct an initial inquiry into a defendant's *pro se* allegations of ineffective assistance through an interchange between court and trial counsel or a simple question-and-answer session, it may also base its evaluation of the allegations "on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations on their face" (*Moore*, 207 Ill. 2d at 78-79), *i.e.*, depending on the circumstances of the case, it need not question defense counsel at all, directly or indirectly.

¶ 86      However, "[i]f the State's participation during the initial investigation into a defendant's *pro se* allegations is anything more than *de minimis*, there is a risk that the preliminary inquiry will be turned into an adversarial proceeding, with both the State and trial counsel opposing the defendant." *Fields*, 2013 IL App (2d) 120945, ¶ 40. As our supreme court recently explained in *People v. Jolly*, 2014 IL 117142:

> "[A] preliminary *Krankel* inquiry should operate as a neutral and nonadversarial proceeding. Because a defendant is not appointed new counsel at the preliminary *Krankel* inquiry, it is critical that the State's participation at that proceeding, if any, be *de minimus*. Certainly, the State should never be permitted to take an adversarial role against a *pro se* defendant at the preliminary *Krankel* inquiry.
>
>      *** [T]he purpose of *Krankel* is best served by having a neutral trier of fact initially evaluate the claims at the preliminary *Krankel* inquiry without the State's adversarial participation, creating an objective record for review. This goal, however, is circumvented when the circuit court essentially allows the State to bias the record against a *pro se* defendant during the preliminary *Krankel* inquiry. A record produced at a preliminary *Krankel* inquiry with one-sided adversarial testing cannot reveal, in an objective and neutral fashion, whether the circuit court properly decided that a defendant is not entitled to new counsel." *Id*. ¶¶ 38-39.

If the circuit court permits the State "to participate in an adversarial fashion during the preliminary *Krankel* inquiry," the error is not harmless but rather is reversible error. *Id*. ¶ 41.

¶ 87      In *Jolly*, our supreme court held that the circuit court committed reversible error when it allowed the State to question the defendant and his trial counsel "extensively in a manner contrary to [the] defendant's *pro se* allegations of ineffective assistance of counsel and to solicit testimony from his trial counsel that rebutted [the] defendant's allegations." *Id*. ¶ 40. It found:

- 19 -

"In other words, the circuit court allowed the State to confront and challenge defendant's claims directly at a proceeding when defendant was not represented by counsel. The State also presented evidence and argument contrary to defendant's claims and emphasized the experience of defendant's trial counsel. Thus, *** the State and defendant's trial counsel effectively argued against defendant at a proceeding when he appeared *pro se*. *** [T]his is contrary to the intent of a preliminary *Krankel* inquiry." *Id.*

¶ 88   In our original opinion, *People v. Flemming*, 2014 IL App (1st) 111925, filed August 15, 2014, we found no error in the State's participation in the preliminary *Krankel* hearing at issue here, holding that the State's participation was *de minimus* as it merely asked defense counsel a few specific questions at the court's direction, without editorializing or arguing or advocating against defendant's position. We held the hearing was a properly conducted and sufficient initial inquiry into defendant's *pro se* claims rather than a "full-blown" second-stage hearing as defendant claimed and the court, therefore, did not err in failing to appoint new counsel for defendant for the hearing.

¶ 89   Pursuant to the supreme court's supervisory order, we have reconsidered the question in light of *Jolly*. On reconsideration, we find *Jolly* does not change our original determination that the hearing was a preliminary *Krankel* inquiry for which the court was not required to appoint new counsel for defendant rather than, as defendant claimed, a "full blown" hearing for which he should have been represented by new counsel to protect his interests. However, *Jolly* does change our determination that the hearing was properly conducted. For the reasons that follow, we find the State's participation in the preliminary *Krankel* hearing is reversible error.

¶ 90   In *Jolly*, the supreme court made clear that the State's *de minimus* participation in a preliminary *Krankel* hearing was acceptable. *Jolly*, 2014 IL 117142, ¶ 38 ("it is critical that the State's participation at that proceeding, if any, be *de minimus*"). But *Jolly* also made clear that, when the State questions a defendant's trial counsel "extensively in a manner contrary to defendant's *pro se* allegations of ineffective assistance of counsel and *** solicit[s] testimony from his trial counsel that rebut[s] defendant's allegations," that participation is not *de minimus*. *Id.* ¶ 40. Here, although the State's participation was minimal, its questioning of defense counsel did tend to counter defendant's *pro* se allegations. Contrary to the supreme court's instruction in *Jolly*, the State's questions to defense counsel and responses received to those questions rebutted defendant's *pro* se allegations, specifically his allegations that his counsel misinformed him regarding the number of stab wounds Gushiniere received and his counsel should have made Nabry's prior history of aggression part of the record. By the State's questions and defense counsel's responses, they "effectively argued against defendant at a proceeding when he appeared *pro se*," which "is contrary to the intent of a preliminary *Krankel* inquiry." *Id.*

¶ 91   Following *Jolly*, we find the court committed reversible error by allowing the State to rebut defendant's *pro se* allegations at the preliminary *Krankel* inquiry. *Id.* ¶ 41. By allowing the State, through its questioning of defense counsel, to rebut defendant's allegations, the record at the preliminary *Krankel* inquiry was not produced in an objective and neutral fashion such that the trial court could properly decide whether defendant was entitled to new counsel. Accordingly, the court committed reversible error in allowing the State to rebut defendant's *pro se* allegations by its questioning of defense counsel during the hearing. We point out that the trial court did not have the benefit of the lessons of *Jolly* at the time it made its decision. We

make no finding as to whether the issues raised by defendant in his *pro se* motion had merit or required the appointment of new counsel.

¶ 92　　　Our supreme court has stated that where, as here, the State's participation in a preliminary *Krankel* inquiry has thwarted the purpose of creating an objective record from which a neutral trier of fact can initially evaluate a defendant's claims, "the appropriate remedy is to remand for a new preliminary *Krankel* inquiry before a different judge and without the State's adversarial participation." *Id.* ¶ 46. Therefore, we remand for a new preliminary *Krankel* hearing before a different trial judge and without the State's arguably "adversarial" participation.

¶ 93　　　　　　　　　　　　　　　　　CONCLUSION

¶ 94　　　For the reasons stated above, we affirm the convictions and remand for entry of judgment and sentencing on the aggravated battery conviction and for a new preliminary *Krankel* hearing, with directions.

¶ 95　　　Affirmed; remanded.