2026 IL App (1st) 232032-U

No. 1-23-2032

First Division
February 23, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14 CR 18500 |
| DERRICK ALLMON, | ) ) | Honorable Joanne F. Rosado |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's denial of defendant's *pro se* motion for ineffective assistance of counsel is vacated, the cause is remanded for a proper *Krankel* inquiry, and jurisdiction is retained.

¶ 2    Following a jury trial, defendant-appellant Derrick Allmon was found guilty of first degree murder in which he personally discharged a firearm that caused the death of the nine-year-old victim and was sentenced to 105 years' imprisonment. Prior to sentencing, defendant filed a *pro*

*se* motion for ineffective assistance of counsel, which the trial court denied, and a motion to reconsider, which the court also denied. Defendant now appeals, arguing that: (1) the trial court erred by failing to conduct a proper inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984); (2) the trial court erred in allowing defendant to represent himself without first ordering a behavioral clinical examination (BCX) or re-admonishing him pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) before sentencing proceedings; and (3) his 105-year sentence is excessive. For the reasons that follow, we vacate the trial court's denial of the posttrial motion, remand to the trial court for a proper *Krankel* inquiry, and retain jurisdiction.

¶ 3                                    I. BACKGROUND

¶ 4     On October 22, 2014, defendant was charged, along with his three codefendants (Jabari Williams, Parris Denard, and Michael Baker), with first degree murder for the shooting of nine-year-old Antonio Smith on August 20, 2014.

¶ 5     Relevant here, the record shows that assistant public defender (APD) Vernon Schleyer was assigned to defendant's case around November 2016.

¶ 6     During a status hearing, on April 18, 2017, defendant interrupted counsel and stated to the court that he wanted to demand trial and counsel was not doing anything for him. The court responded that counsel indicated that he was not ready for trial and it was not defendant's decision. The court then provided the next court date.

¶ 7     On October 5, 2017, APD Schleyer informed the court that defendant filed a motion to dismiss based on prejudice due to misnomer. The court stated that defendant could not file a *pro se* motion while being represented by counsel and advised counsel to confer with defendant on whether it was a meritorious motion. The court explained to defendant that counsel is to file all motions and represent him while in court and advised that "if [he] want[s] to go *pro se* and do this

on [his] own, then [he] certainly [has] the right to do that, but as of right now Mr. Schleyer is [his] attorney." Defendant then stated that he wanted to fire APD Schleyer, and the court responded that he could hire another lawyer and new counsel needed to be present in court on November 20, 2017.

¶ 8 On July 16, 2020, defendant once again informed the court that he was firing APD Schleyer, and he would have a private attorney by the next court date.

¶ 9 On August 3, 2020, Michelle Gonzalez entered her appearance on behalf of defendant.

¶ 10 On July 21, 2021, Gonzalez filed a motion to withdraw as defendant's counsel. Defendant informed the court that he was seeking another private attorney.

¶ 11 On September 15, 2021, defendant stated that he was unable to retain another attorney and the court reappointed the public defender's office to represent him. Defendant refused to be represented by APD Schleyer, and he was given another opportunity to hire private counsel.

¶ 12 On November 17, 2021, defendant informed the court that he was unable to retain private counsel and that he would represent himself. The court admonished defendant of his rights to be represented by an attorney or to represent himself. The court then explained each of defendant's pending charges and their relevant penalties. The court thoroughly explained to defendant the disadvantages of representing himself, and defendant indicated that he understood and still wanted to proceed *pro se*.

¶ 13 On December 3, 2021, defendant filed a "Petition for Replacement of Counsel." Therein, defendant asserted that he would not receive a fair trial if APD Schleyer continued as his attorney and requested that the court hold a hearing on this issue. The record does not indicate that the court specifically addressed this filing.

¶ 14 On January 25, 2022, the court again inquired if defendant wanted to represent himself. Defendant responded: "I do, but I don't. Like I don't know what I'm doing, but you gave me no

choice because the lawyer you're trying to put on there is a conflict of interest. He told me there's nothing for me. If that's the case, that's still the way it stand[s], I'm going to be *pro se*." The court asked for a yes or no answer, and defendant answered in the affirmative.

¶ 15    On March 16, 2022, the court had another discussion with defendant regarding whether he wanted to represent himself. Defendant stated that he wanted to remain *pro se* if the alternative was representation by APD Schleyer. He also stated that he would "put his hands" on APD Schleyer if he was appointed to represent him. The court informed defendant that neither defendant nor the court could pick which attorney the public defender's office assigned to his case. Subsequently, defendant requested representation by the public defender's office, and the court re-appointed the public defender.

¶ 16    Defendant's case proceeded to a jury trial, beginning on April 26, 2023, at which he was represented by APD Schleyer. The following facts were adduced at trial.

¶ 17    Brandi Lee, the victim's mother, testified that as she was driving home from work on August 20, 2014, she learned that her son was missing. She drove around looking for him and eventually called the police, who came to her house. They directed her to Comer's Children's Hospital, where she learned that her son had died.

¶ 18    Brandion Smith, the victim's brother, testified that, on the day in question, his brother and sister argued with each other and Antonio walked out of the apartment and did not return.

¶ 19    Chicago police sergeant Erik Ruhnke testified that, around 4:05 p.m., on August 20, 2014, he went to 1241 East 71st in Chicago in response to a call of a person shot. In the alley behind an apartment complex, Ruhnke found the victim on the ground. Paramedics arrived and transported him to the hospital.

¶ 20   Codefendant Michael Baker testified that he was charged with murder in this case, pled guilty to a reduced charge of conspiracy to commit murder, and sentenced to 15 years in prison. He was released on parole earlier in 2023 but, at the time of trial, was in custody for a parole violation. Baker testified that the State had not made any promises regarding his new case.

¶ 21   On August 20, 2014, Baker drove his red Dodge Avenger to pick up his girlfriend, Shauntay Denard, whose cousin is codefendant Parris Denard. He dropped Shauntay off at her house and drove to visit Parris. At Parris's home were defendant (also known as "Little Billy"), codefendant Jabari Williams, Diontay Outlaw, Shaniqua Roan, and another woman, as well as Parris. Defendant, Parris, and Williams were members of the Sircon City gang, whose territory was on the east side of the neighborhood's viaduct, whereas the Pocket Town gang operated on the west side of the viaduct. When Baker arrived, Williams and defendant were "talking about going to shoot at the ops[,]" meaning rival Pocket Town gang members. Specifically, Baker heard defendant say he was "bored" and he was "ready to go slide on ops." He also observed both Williams and defendant brandishing guns, one silver and the other black. Baker, defendant, Parris, Outlaw, and Williams then left the house to go to Pocket Town with Outlaw and Williams in Baker's car and defendant in Parris's black Buick LaCrosse. Williams stored his gun in the trunk of Baker's car, which was accessible from the backseat. Williams instructed Baker to stop the car near the viaduct on 71st Street when they observed two men. Williams flagged down Parris's car, and defendant exited the car and spoke with Williams. Williams instructed defendant "to go through the cut and shoot the two guys." Williams then passed the gun from the trunk to defendant and defendant left and walked between two houses. Baker drove back towards Parris's house while he saw Parris drive in a different direction. When Baker arrived on Dorchester Street, where Parris lived, he saw defendant running. Defendant approached Baker's car and stated that he "hit a

shorty," which Baker took to mean he shot a young person. Defendant further stated to Baker that "he turned around, the little boy scared him and he started shooting[,]" firing six or seven times. Defendant stated that he tossed the gun in a sewer, and Williams instructed defendant to go into Parris's house and urinate on his hands to remove the gunpowder. After defendant went to Parris's house, Baker drove him home, approximately ten blocks away from Parris's house. Baker testified that he did not see the shooting and he did not hear any gunshots that evening. On September 18, 2014, at the request of police officers, Baker went to a police station where he was arrested and charged with first degree murder.

¶ 22     Parris, another codefendant, testified that he was charged with murder in this case and pled guilty to a reduced charge of solicitation of first degree murder in exchange for his testimony against defendant and a 17-year prison sentence. Similarly to Baker's testimony, Parris testified that he, defendant, Outlaw, and Williams were members of the Sircon City gang, and he explained where that gang and their rival gang, Pocket Town, operated. He testified that, on the day in question, he was at his home on Dorchester Street with defendant, Baker, Outlaw, Williams, Roan, and a friend of Roan's. While this group was in his house, defendant did not participate in the conversation, but everyone "agreed to ride around" Pocket Town. He specified that Williams was discussing riding around in rival territory and Williams had a gun with him that day. Parris later admitted that, in his guilty plea, he specifically agreed that defendant was the one who was talking about shooting rival gang members.

¶ 23     Parris drove his car with defendant as the sole passenger, and Parris stated that defendant did not bring a weapon into the car. At some point, Parris stopped his car on 71st Street, and defendant went to speak with the individuals in Baker's car, which had also pulled over. Parris testified that he did not recall defendant having a gun in his hand. After being confronted with the

statement he made to police, Parris admitted that he initially stated that someone in the other car passed defendant a gun. Parris did not know what defendant spoke to them about, and he left the area to go back to his house. After arriving home, which was only a couple blocks away, he heard gunshots. Some time later, Parris observed defendant running towards his house. At Parris's house, defendant stated that "a kid got shot." After being reminded of his statement to police, Parris agreed that he previously stated that defendant admitted to shooting a kid multiple times. On cross-examination, Parris admitted that, after his arrest, he provided several different versions of what happened that day.

¶ 24    Kenneth Chambers testified that, on August 20, 2014, between 3 and 4 p.m., he was visiting a friend who lived on the 1300 block of 71st Street. He observed through the window of his friend's door a young man walking past the house, and soon after, he heard five or six gunshots in rapid succession. Chambers exited the front door and saw the same young man walking back in the other direction towards the viaduct. Chambers left his friend's house and drove in the same direction the man was walking. Chambers observed the man looking behind him repeatedly. When the man turned onto Dorchester, Chambers continued driving to his home. Later that day, Chambers learned from his friend that a child was killed, and Chambers permitted his friend to pass his phone number on to the detectives investigating the murder. Chambers provided a statement to the detectives, and some days or weeks later, he saw an article in the newspaper about the murder. The article included pictures of some individuals, one of which Chambers identified as the man he saw walking by his friend's house that day. Chambers informed the police of this, and he later selected defendant from a photo array as the individual he observed that day.

¶ 25    Shaniqua Roan testified that, on the day in question, she was at Parris's house with Dilivia Stamps, Outlaw, Williams, Parris, Baker, and defendant. She testified that Outlaw is the father of

her children, and she had known Baker and Williams for some time but was less familiar with defendant. She heard defendant say that "he wanted to do a hit," meaning a shooting, and all of the men left the house in Parris's and Baker's cars. Defendant later returned, and he was "visibly shaken," "nervous," "sweating," and "pacing." Roan heard him say that he "f*** up" and "shot a shorty." The other men eventually came back to the house, and defendant went home. On September 18, 2014, Roan spoke to the police about the shooting, and on September 19, 2014, she testified before a grand jury.

¶ 26    Dilivia Stamps' testimony was similar to Roan's. She also heard defendant state that "he wanted to go ride down on some ops." She also testified that, when defendant returned to Parris's house, he was "out of breath and sweaty." She observed defendant enter the bathroom, after which he explained to her that he had to urinate on his hands to "get the gun residue off." She also heard defendant state that he shot a kid. On September 18, 2014, Stamps went to the police station, provided a video-recorded statement, and identified defendant, Parris, and Baker as the individuals that were at Parris's house that day. The next day she testified before a grand jury. Stamps further testified that defendant did not tell her what he did with the gun or how many shots he fired; however, she testified before the grand jury that defendant stated that he put the gun in the sewer and he shot the victim five to seven times.

¶ 27    Dr. Ponni Arunkumar, the Cook County Chief Medical Examiner, testified that the autopsy on the victim was performed by a doctor no longer employed by the Cook County Medical Examiner's Office, and Dr. Arunkumar was testifying as a substitute medical examiner. She reviewed the autopsy report and testified that the victim had several gunshot wounds: a graze wound on his left palm and wrist, a bullet lodged in his left thumb, a gunshot wound that entered the back of his right forearm, a gunshot wound on his right shoulder that went into his chest cavity,

a gunshot wound on his upper left chest, and a gunshot wound on his back that went through his spine. The projectile recovered from the victim's hand was provided to the police. She testified that the cause of death was multiple gunshot wounds and the manner of death was homicide.

¶ 28    Chicago police detective Carlos Cortez testified that he was assigned to investigate this case with his partner, Roger Sandoval. When he arrived at the scene, the victim had already been transferred to the hospital. From canvassing the area, he was able to obtain video footage from a CTA bus traveling east on 71st Street that day, from the Gary Comer Youth Center located at 7200 South Ingleside Avenue, and from Paul Revere School located at 1010 East 72nd Street. The videos showed the victim walking on 71st and 72nd Streets at approximately 3:45 p.m. In the videos, he was not being followed or chased by anybody. The videos also showed Baker's and Parris's cars driving near the location of the shooting at 3:50 p.m.

¶ 29    Magdy Khattab testified that he is a sub-foreman and investigator for the Chicago Department of Water Management. On September 18, 2014, law enforcement requested assistance from Magdy in searching a sewer on 71st Street. During his search, Magdy recovered a .380-caliber semiautomatic handgun.

¶ 30    Police recovered four cartridge cases and one fired bullet from the scene near the victim's body. Those items and the fired projectile recovered from the victim's body were fired from the gun found in the sewer.

¶ 31    The police also swabbed the fence near the victim's body because they believed someone may have jumped over the fence. Those swabs were submitted for DNA analysis. Forensic scientist Megan Neff testified that, in 2014, she analyzed the swabs and was unable to generate a DNA profile from the samples. In 2019, Neff re-analyzed the swabs and obtained a human male DNA partial profile. The victim and Williams were excluded as contributors to the profile. Defendant

was included as a contributor to the profile, which would be expected to occur in approximately one in 3.2 million unrelated individuals.

¶ 32    The parties stipulated that defendant was released from the Illinois Department of Corrections on August 1, 2014, on mandatory supervised release. One of the conditions of his release was electronic monitoring. He was permitted to leave his home from 6 a.m. to 5 p.m. on Mondays, Wednesdays, and Fridays. On the day of the incident, defendant left his home at 9:07 a.m. and returned at 4:22 p.m.

¶ 33    After closing arguments, the jury found defendant guilty of first degree murder and of personally discharging a firearm that proximately caused the victim's death. The jury additionally found that the victim was under 12 years of age at the time of the shooting.

¶ 34    On May 22, 2023, APD Schleyer filed a motion for a new trial.

¶ 35    On May 25, 2023, the parties appeared before the court, at which time defendant informed the court that he wanted to proceed "pro persona." The court explained that "there is no such thing as pro per" and explained that, if defendant proceeded *pro se*, he would be held to the same standard as an attorney and would not be given additional time in the law library. The court provided defendant with a form motion for him to proceed *pro se* and allowed him time to review the form.

¶ 36    The case was later recalled. The court inquired as to the highest grade level achieved, and defendant answered 9th grade. The court additionally inquired about defendant's "neuro medication." Defendant explained he was on four different medications for "[d]epression, nerve, nervous." The court then confirmed that defendant was able to read his legal rights as set forth in the form and explained to defendant the advantages and disadvantages of representing himself. Defendant stated that he did not understand the charges and potential consequences in his case. In

response, the court explained that he was charged with first degree murder, the jury found him guilty, the State was seeking an extended term sentence because the crime was committed against a person under 12 years of age, and the sentencing range was 45 years to life in prison. The court then asked if defendant still wanted to represent himself, and he answered in the affirmative.

¶ 37    On June 11, 2023, defendant filed a *pro se* motion alleging ineffective assistance of counsel. Therein, defendant claimed that counsel failed to "properly give assistance" during the criminal proceedings, failed to advocate for defendant, failed to present defendant's version of the facts, did not allow defendant to testify on his own behalf, deprived defendant of his right to a speedy trial, withheld evidence pertaining to his codefendants, failed to effectively communicate with defendant prior to trial, and failed to contact Outlaw who would testify on defendant's behalf that he was coerced into implicating defendant.

¶ 38    On July 11, 2023, defendant requested to amend counsel's motion for a new trial, which the court allowed. The court reviewed defendant's amended motion which added a claim of ineffective assistance of counsel. After a "brief pause," the court stated there was no *prima facie* case and denied the motion.

¶ 39    On August 11, 2023, defendant filed a motion to reconsider the court's ruling. This motion contained many of the same allegations against counsel as his ineffective assistance motion. However, defendant also claimed that counsel was ineffective was failing to request a competency hearing for defendant where he has a history of "extreme psychiatric behavior," has been admitted to a psychiatric facility several times, and has been taking psychiatric medications throughout his incarceration and prior to his arrest. He further claimed that counsel failed to request to remove a juror during *voir dire* and, during jury selection, counsel refused to relay to the State defendant's request to enter a guilty plea in exchange for a sentence of 22 years.

¶ 40     On August 23, 2023, the court considered defendant's motion to reconsider. The court stated: "Mr. Schleyer was in court on the last court date, we had an opportunity to ask him questions in regard to his representation of you, in reading this there does not appear to be anything else that was new." The court also stated that it had inquired previously about defendant's psychiatric medications and it did not "see anything else that is new and would make me reverse my prior finding so your motion to reconsider is denied."

¶ 41     That same day, defendant filed an amended motion for a new trial incorporating counsel's claims and adding new ones, including, *inter alia*, his claims of ineffective assistance of counsel and a claim that the trial court erred in failing to conduct a competency hearing.

¶ 42     On October 2, 2023, after hearing both parties' arguments, the court denied defendant's *pro se* motion for a new trial. Before proceeding to the sentencing hearing, the court asked defendant what medication he was prescribed and whether he had taken it that day. Defendant responded that he had taken his medications.

¶ 43     During the sentencing hearing, the State introduced 19 victim impact statements and defendant's presentencing investigation (PSI) report. The PSI indicated that defendant's criminal history consisted of a 2013 conviction for unlawful use of a firearm as a gang member. The PSI showed the pending charges against defendant as well, namely two cases for aggravated battery of a peace officer and one case for attempt murder, aggravated battery with a firearm, and other weapons offenses.

¶ 44     Detective Cortez testified that he investigated a shooting of two teenage boys that occurred on August 11, 2014, a few days prior to the instant offense. Nine .380-caliber cartridge cases were recovered from the scene of that crime, and based on the victims' descriptions of the shooter, defendant was detained in connection with that shooting. Gunshot residue was found on

defendant's right hand, and the cartridge cases matched those found in this case. The charges for that case were pending.

¶ 45    Defendant did not present any evidence in mitigation.

¶ 46    In imposing its sentence, the court stated that it had considered all of the factors. It also stated that it was "taking into account in this sentencing" defendant's pending charges. The court sentenced defendant to 95 years in prison for first degree murder on counts 16 and 17 and 105 years in prison on counts 22 and 23. All counts were merged into count 22. Defendant did not file a motion to reconsider the sentence.

¶ 47    This appeal followed.

¶ 48                                    II. ANALYSIS

¶ 49    On appeal, defendant argues that (1) the trial court erred by failing to conduct a *Krankel* inquiry; (2) the trial court erred in allowing defendant to represent himself without first ordering a BCX or re-admonishing him pursuant to Rule 401(a) before sentencing proceedings; and (3) his 105-year sentence is excessive.

¶ 50    As to the first claim on appeal, defendant contends that the trial court failed to conduct a preliminary *Krankel* inquiry into his allegations against trial counsel, which showed possible neglect. On that basis, defendant requests that this court remand this matter to the trial court for a proper inquiry and to appoint new counsel to investigate his claims, if necessary.

¶ 51    *Krankel* governs the treatment of *pro se* posttrial motions alleging ineffective assistance of counsel. *People v. Roddis*, 2020 IL 124352, ¶ 34. A *Krankel* hearing "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims" and "is intended to promote consideration of *pro se* ineffective assistance claims in the trial court and to limit issues on appeal." *People v. Patrick*,

2011 IL 111666, ¶¶ 39, 41. New counsel is not automatically required in every instance where a defendant presents a *pro se* claim of ineffective assistance. *Roddis*, 2020 IL 124352, ¶ 35. Rather, when a defendant presents such a claim, "the court should first examine the factual basis of the defendant's claim." *Id.* The court may deny the motion if it determines that the claim lacks merit or pertains only to matters of trial strategy, but if the allegations show possible neglect, new counsel should be appointed. *Id.* We review whether a trial court properly conducted a *Krankel* inquiry *de novo*. *People v. Jolly*, 2014 IL 117142, ¶ 28.

¶ 52    "The trial court, most familiar with the proceedings at issue, remains best situated to serve the interests of judicial economy by extinguishing conclusory claims." *Roddis*, 2020 IL 124352, ¶ 56. Although our supreme court has stated that "some interchange between the trial court and trial counsel *** is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim[,]" it is not a requirement. *People v. Moore*, 207 Ill. 2d 68, 78-79 (2003). Instead, the court's examination of the defendant's claim may take any of the following forms: (1) the court may question trial counsel as to the facts and circumstances related to the defendant's allegations, (2) the court may request additional information from the defendant, and (3) the court may rely on its own knowledge of the proceedings and of counsel's performance at trial in determining the sufficiency of the allegations. *People v. Ayres*, 2017 IL 120071, ¶ 12.

¶ 53    The State contends that the trial court's examination took the third form and was sufficient to satisfy *Krankel* and determine that defendant's claims were meritless. We disagree.

¶ 54    In the instant case, the record shows that, on June 11, 2023, defendant filed his *pro se* motion for ineffective assistance of counsel, containing at least five distinct and specific allegations against APD Schleyer. These included, *inter alia*: counsel's failure to present defendant's version of the facts, counsel's refusal to allow defendant to testify on his own behalf,

counsel's withholding of evidence pertaining to the codefendants, counsel's failure to effectively communicate with defendant prior to trial, and counsel's failure to contact Outlaw who would testify on defendant's behalf that he was coerced into implicating defendant. When defendant's motion was brought to the court's attention on July 11, the court reviewed the motion during a "brief pause" in the proceedings and then stated that there was no *prima facie* case and denied the motion.

¶ 55    Thereafter, on August 11, defendant filed a motion to reconsider his *pro se* motion for ineffective assistance, which included three additional allegations: (1) counsel failed to request a competency hearing for defendant where he has a history of "extreme psychiatric behavior," has been admitted to a psychiatric facility several times, and has been taking psychiatric medications throughout his incarceration and prior to his arrest; (2) counsel failed to request to remove a juror during *voir dire*; and (3) during jury selection, counsel refused to relay to the State defendant's request to enter a guilty plea in exchange for a sentence of 22 years.

¶ 56    On August 23, the court considered defendant's motion to reconsider. The court stated: "Mr. Schleyer was in court on the last court date, we had an opportunity to ask him questions in regard to his representation of you, in reading this[,] there does not appear to be anything else that was new." Defendant informed the court that he had added a claim regarding counsel's failure to request a competency hearing. The court responded: "Okay. And when I inquired with regards to medication and anything else prior to us starting trial[,] you indicated that you were fine and you were ready to go to trial." Defendant informed the court that it had asked which medications he was prescribed but not whether he had taken them that day. The court responded: "Okay. I don't see anything else that is new and would make me reverse my prior finding so your motion to reconsider is denied."

¶ 57    A trial court's method of inquiry pursuant to *Krankel* is "flexible," and "[t]here is no set format" for how the inquiry is conducted. *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 85. However, in this instance, we find that the trial court's inquiry simply does not pass *Krankel* muster where neither counsel nor defendant was questioned on the allegations in the motion and the court made no explicit record of its consideration of the claims. Instead, it is clear from the record that " 'defendant's motion was precipitously and prematurely denied.' " *Moore*, 207 Ill. 2d at 80 (quoting *People v. Robinson*, 157 Ill. 2d 68, 86 (1993)). "[T]he whole point of *Krankel* is that we should *not* kick the can down the road. Rather, we should maximize the number of claims that are heard when and where they are most likely to be resolved correctly and efficiently." *People v. Downing*, 2019 IL App (1st) 170329, ¶ 41. The trial court's conduct in response to defendant's claims of ineffective assistance resolved nothing and failed to satisfy the goals of a *Krankel* inquiry, *i.e.*, "to limit issues on appeal" (*Patrick*, 2011 IL 111666, ¶ 41) and to "create the necessary record for any claims raised on appeal" (*Jolly*, 2014 IL 117142, ¶ 38).

¶ 58    Additionally, "the trial court was not in a position to evaluate all of the ineffective assistance claims simply by relying on facts within its knowledge." *People v. Gilmore*, 365 Ill. App. 3d 1023, 1037 (2005); see also *People v. Peacock*, 359 Ill. App. 3d 326, 339-340 (where the defendant's allegations were outside the knowledge of the trial court, a separate inquiry of counsel was necessary). Although some of defendant's allegations, such as whether a competency hearing was necessary or whether a juror was selected after stating that they could not be fair or impartial, could be determined from the court's own knowledge of the proceedings, others involved facts and circumstances outside of the record and of which only counsel and defendant would have knowledge. See *People v. Vargas*, 409 Ill. App. 3d 790, 803 (2011) (finding it impossible to fully evaluate the defendant's claims without any inquiry where they "related to matters de hors the

record and not readily ascertainable by a trial judge"). For instance, whether counsel interviewed Outlaw to determine whether he would testify on defendant's behalf that he was coerced into identifying defendant is clearly outside of the court's own knowledge. An inquiry of counsel was necessary to determine the veracity of this allegation. Thus, we conclude that the trial court's inquiry was inadequate, and the proper remedy here is "to remand the matter to the trial court for the limited purpose of allowing the trial court to conduct the required inquiry." *People v. Willis*, 2013 IL App (1st) 110233, ¶ 73; see *Ayres*, 2017 IL 120071, ¶ 26 (remanding for a *Krankel* inquiry where the court failed to conduct any inquiry into the factual basis of the defendant's allegations).

¶ 59    There is, however, yet another reason for our reticence to accept that the court's decision resulted from its own knowledge of the counsel's performance. The record shows that, when considering the motion to reconsider, the court not only failed to recall that it had not asked trial counsel any questions about defendant's allegation on the previous court date but also failed to recall that trial counsel had not even been present in court when the court considered the initial *pro se* motion. The court apparently, although mistakenly, believed that it had conducted a more extensive inquiry than it actually had, which also suggests to us that the court was aware of the scope of inquiry required under *Krankel*. The court's failure to create an adequate record on defendant's ineffective assistance claims is additionally troubling where, since 2017, defendant had consistently raised concerns about counsel's representation, asserting that he would not receive a fair trial if represented by APD Schleyer. It is clear from our review of the record that defendant had every intention of claiming ineffective assistance of trial counsel, giving the trial court all the more reason to provide this court with a sufficient record, including an inquiry of counsel as to the factual basis for the allegations. As our supreme court has stated, "the inquiry is not burdensome upon the circuit court, and the facts and circumstances surrounding the claim will be much clearer

in the minds of all involved when the inquiry is made just subsequent to trial or plea, as opposed to years later on appeal." *Ayres*, 2017 IL 120071, ¶ 21.

¶ 60    Nonetheless, in its brief, the State asserts that each of defendant's allegations of ineffective assistance of counsel is meritless, particularly because defendant would not be able to demonstrate prejudice as a result of the unreasonable assistance, and therefore, the trial court's decision was not manifestly erroneous. However, an analysis of the merits of defendant's allegations is not appropriate under the circumstances before us. Where "no record at all was made on defendant's claims of ineffective assistance of counsel[,] *** it is simply not possible to conclude that the trial court's failure to conduct an inquiry into those allegations was harmless beyond a reasonable doubt." *Moore*, 207 Ill. 2d at 81. Accordingly, because we have concluded that the court's *Krankel* inquiry was inadequate, we remand this case for the limited purpose of conducting a proper inquiry. Should that inquiry reveal possible neglect by counsel, the trial court must appoint independent counsel to investigate defendant's claims and conduct further proceedings as necessary.

¶ 61    Finally, in light of our decision to remand this case, we need not address defendant's other claims of error on appeal. Depending on the result of the *Krankel* inquiry, defendant's remaining claims may become moot. *People v. Bell*, 2018 IL App (4th) 151016, ¶ 37. Thus, we are remanding for further proceedings on defendant's claims of ineffective assistance of counsel while retaining jurisdiction. See *People v. Wilson*, 2019 IL App (4th) 180214, ¶ 26. If defendant is not satisfied with the outcome of those proceedings, "defendant can still appeal to the appellate court based on his assertion of ineffective assistance of counsel or the other three issues which were raised in the appellate court *** but were not addressed." *Krankel*, 102 Ill. 2d at 189.

¶ 62                                III. CONCLUSION

¶ 63    For the reasons stated, we vacate the denial of defendant's posttrial motion and remand for the trial court to conduct a proper *Krankel* inquiry into defendant's claims of ineffective assistance of counsel.

¶ 64    Vacated and remanded with directions. Jurisdiction retained.