2026 IL App (1st) 241697-U

FIFTH DIVISION
March 27, 2026

1-24-1697

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 19 CR 6002001 |
| | ) | |
| | ) | |
| DERRICK RANDLE, | ) | Honorable |
| | ) | Diana L. Kenworthy, |
| Petitioner-Appellant. | ) | Judge Presiding. |

_____

JUSTICE WILSON delivered the judgment of the court.
Justices Mikva and Oden Johnson concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court conducted an adequate inquiry into defendant's posttrial ineffective assistance of counsel claims.

¶ 2    Following a bench trial, defendant Derrick Randle was convicted of murdering his aunt,

Yvonne Randle (Yvonne), and cousin Antonio McDaniels (McDaniels), and was sentenced to

mandatory life in prison. On appeal, Randle argues that the trial court failed to conduct an adequate inquiry into his claim of ineffective assistance under *People v. Krankel*, 102 Ill. 2d 181 (1984). For the following reasons, we affirm.

¶ 3 BACKGROUND

¶ 4 At trial, Robert Lawrence testified that he knew Randle, Yvonne, and McDaniels for his whole life. On November 21, 2018, at approximately 9:45 a.m., he was at his girlfriend Jhene Cooper's house when he received a phone call from McDaniels, who stated that Randle shot him. Lawrence called for an ambulance and then drove to Yvonne's home.

¶ 5 When he arrived, he observed police on scene. Lawrence then received a phone call from an individual stating that Randle was seen standing on Halsted Street. When he located Randle on Halsted, he got out of his car, punched him, and dragged him into his vehicle so that he could deliver Randle to the police. He brought Randle back to Yvonne's house, where Randle was taken into custody.

¶ 6 Lawrence testified that a few nights before the murders, Randle had called him and said he needed to talk. When Lawrence arrived at Yvonne's house, Yvonne did not know where Randle was. She told Lawrence that Randle had "broke off" his "house arrest band." Lawrence later located Randle running around the neighborhood, acting erratically. On two occasions, Randle told him that his deceased grandmother was talking to him. In the days leading up to the murders, Lawrence did not have any difficulty speaking with Randle; their conversations were logical, and Randle made sense when he spoke.

¶ 7 Chicago police officer Jaime Tomczyk testified that, on November 21, 2018, he responded to a call of a person shot in the area of 6637 South Lowe. While on the scene, he observed a vehicle pull up and saw Randle being pulled out of the vehicle. Randle was then held

on the ground by another occupant. Officer Tomczyk ran towards the two individuals and placed Randle in custody. This was captured on his body worn-camera and played in open court. The parties entered into a stipulation stating that it was determined that Randle discharged a firearm.

¶ 8 Officer James McDonough testified that he was one of the evidence technicians assigned to process the scene. While at the scene, he and another technician took photographs, recovered fired cartridge cases, fired bullets, and live rounds. McDonough testified that police did not find any bullet holes, live rounds, or fired bullets on the porch outside Yvonne's house.

¶ 9 Yvonne Randle was found deceased on the floor in the entryway outside of the first-floor apartment, and Antonio McDaniels was transported to a hospital.

¶ 10 Detective Andrew Janik testified that Randle was transported to Area South and placed in an Electronically Recorded Interview (ERI) holding room, and he was recorded for the entire time he was in the room. Randle was in the room for approximately nine hours, and while he was in the room he repeatedly asked to go home and for a larger room. Randle had to be handcuffed to the wall because he refused to stop kicking and banging on the door. When Detective Janik spoke with Randle, Randle appeared to understand his questions and answered appropriately. However, at one point, Randle took off his shoe and threw it at the overhead lights, shattering the glass. Randle had to be removed from the room due to the broken glass on the floor. Detective Janik later learned that Antonio McDaniels was pronounced dead at the University of Chicago Hospital.

¶ 11 A few days later, Detective Janik was able to recover security camera footage from 6641 South Lowe, one house south of where the shooting occurred. The parties entered into a stipulation, stating that there was a security camera located at 6641 South Lowe and that the footage from this camera was recovered by Detectives Janik and Vaci. Detective Janik observed

the video taken from the neighboring house and testified that it depicted the homeowner exiting 6641 South Lowe. A short time later, Randle ran in front of the home's security camera. Randle then slowed to a walk or jog and threw an object with his right hand to the ground. After viewing this, Detective Janik directed Detectives Vaci and Evans to go out to the vacant lot where Randle was seen on the video throwing the object. Detectives Vaci and Evans searched the lot and recovered a Springfield 9mm handgun in the same area where Randle was seen throwing the item. The surveillance video was admitted into evidence and published while Detective Janik narrated its contents. Detective Janik also recovered security camera footage from several businesses located at 67th and Halsted that showed Randle pacing the area for approximately an hour.

¶ 12    Detective Matthew Evans testified that on November 27, 2018, he, Detective Janik, and Detective Vaci went to the location of 6641 South Lowe to review and recover surveillance footage. The video showed Randle discarding an object in a vacant lot. Detectives Evans and Vaci went to the vacant lot and searched for the item. They cleared the snow with their feet and recovered a two-tone 9mm Springfield semiautomatic handgun. He inventoried the firearm.

¶ 13    The parties then entered a stipulation that Illinois State Police forensic scientist Alexis Bean would testify that she tested fourteen fired casings recovered from the scene and determined they were fired from the firearm recovered from the vacant lot. She also determined that ten of the fired bullets, six of which were recovered by the Chicago Police Department and four of which were recovered by the Cook County medical examiner, were all fired from the firearm recovered in the vacant lot.

¶ 14    In addition, the parties stipulated that Dr. Mayra Khan of the Cook County medical examiner's office would testify that she conducted an examination of Antonio McDaniels and

concluded, to a reasonable degree of scientific certainty, that his death was caused by multiple gunshot wounds and the manner of death was homicide. The parties also stipulated that Dr. Eimad Zakariya of the Cook County medical examiner's office would testify he conducted an examination of Yvonne Randle, and concluded, to a reasonable degree of scientific certainty, that Yvonne's death was caused by multiple gunshot wounds and the manner of death was homicide.

¶ 15    The parties then stipulated to the entry of the ERI. The State rested. Randle's motion for a directed finding was denied.

¶ 16    To support his insanity defense, Randle called Dr. Carolyn Shima, who testified that she was employed by the University of Chicago Hospital. She attended medical school at Rush Medical College starting in 2008 and then completed her residency in psychiatry at the University of Chicago from 2013 until 2017 and was the Chief Resident in 2017. After relaying her educational and professional background, she was found qualified as an expert in forensic psychiatry without objection. She testified that she was contacted directly by defense counsel to conduct the evaluation of Randle's mental status at the time of the offense and that she worked with defense counsel in the past.

¶ 17    Dr. Shima testified that she met with Randle once on September 17, 2019, for three hours, to assess him for sanity at the time of the offense. As part of her evaluation, she reviewed his department of children and family services (DCFS) and school records; Randle's medical records from Mount Sinai hospital, Cook County health and hospital system, Hartgrove Behavioral Health System, and St. Bernard hospital; as well as Chicago Police Department records from the incident, Grand Jury transcripts, and the report from the State's expert, Dr. Cooper.

¶ 18    At the time of her evaluation, Dr. Shima diagnosed Randle with borderline personality

disorder, bipolar disorder, manic episode with psychotic features, generalized anxiety disorder, and post-traumatic stress disorder (PTSD). Dr. Shima testified that Randle reported memory loss around the time of the events and that he was not consciously aware of committing the murders. Dr. Shima testified that at the time of the incident, she believed Randle had a diagnosis of borderline personality disorder, and when the murders occurred, Randle was suffering from a manic episode. Dr. Shima stated that Randle endorsed every criterion of a manic episode based on how he described his symptoms leading up to the offense. In Dr. Shima's opinion, "due to [Randle's] mental illness [he] was unable to appreciate the criminality and wrongfulness of his conduct and as such would not be criminally responsible" for his actions. Dr. Shima stated she based her opinion on a number of factors, including Randle's diagnosis from prior medical records as well as his school and state records.

¶ 19    Randle had a history of psychotic symptoms. Records from DCFS indicated that Randle had various legal guardians as a child, including his grandmother and Yvonne, and he spent time at a number of foster placements. During this time, he suffered physical, emotional, and sexual abuse. In November 2010, he was diagnosed with bipolar disorder at Hartgrove Behavioral Health and again in August 2011 at Mt. Sinai Hospital. The reported symptoms included suicidal ideation, hallucinations, hearing voices, aggression, racing thoughts, and sleep disturbances.

¶ 20    On cross-examination, Dr. Shima acknowledged the records from Mt. Sinai and Hartgrove were six or eight years old. She further acknowledged that on June 11, 2019, Dr. Tushar Advani, of Cermak Hospital, diagnosed Randle with differential adjustment disorder and cannabis abuse and saw Randle several more times, where he made the same diagnosis in October 2019, December 2019, and February 2020. Dr. Advani did not diagnose Randle with affective psychosis or PTSD. Randle was not taking Depakote or Prozac and was only taking

medication for nightmares associated with PTSD.

¶ 21   Dr. Shima stated that another factor she found significant was Randle's behavior at the time of his arrest. Dr. Shima stated that she "took into account that there was significant evidence that [Randle's] behavior was grossly disorganized and psychotic prior to and at the time of his arrest, and he did not appear to be behaving in a rational manner." She stated that Randle told her that he cut off his ankle bracelet because he thought the police were coming to kill him and would use it to track him. She stated that Randle acted erratically while in the interview room and was observed jumping fences and reported hearing his deceased grandmother speaking to him.

¶ 22   She also acknowledged on cross-examination there were medical records from St. Bernard Hospital when Randle was seen in the emergency room five days prior to, as well as the day before, the murders. Those records stated that Randle's emotional status was described as calm/relaxed, noted no current stressors and indicated that no psychiatric evaluation was needed. Furthermore, Dr. Shima acknowledged that the night before the murders, Randle's girlfriend stated she and Randle spoke calmly about their breakup.

¶ 23   Dr. Shima additionally testified that her opinion was also based on the fact that Randle did not have a non-psychotic motive to murder the victims. Yvonne was part of Randle's support system. However, she acknowledged that Randle reported that Yvonne had physically abused him with belts and shoes, attempted to hit him with pans, and attempted to drown him in first or second grade by holding his head under water. Also, after Randle was removed from Yvonne's home by DCFS, he was sexually and physically abused by multiple foster parents.

¶ 24   Another factor Dr. Shima considered was that Randle did not make a coherent effort to evade discovery because "the victims were murdered in plain view of the street" on the front

porch, and he was found four blocks from Yvonne's home at a high-traffic intersection. On cross-examination, the State asked Dr. Shima about her opinion being based on her mistaken belief that Randle had committed the shooting in broad daylight on the front porch, when in fact the evidence showed that the shootings took place in the home. Dr. Shima testified that she based her opinion on the police reports stating McDaniels was found on the front porch and Yvonne's body was found just inside the door. Dr. Shima agreed that Randle fled the scene with the murder weapon.

¶ 25    After being extensively cross-examined by the State about where the shooting took place, the following exchange occurred on cross-examination:

"Q: Are you willing to entertain the possibility that when [Randle] fled the scene with the murder weapon that A.J. McDaniels wasn't on the front porch yet?

A: Mr. Randle told me during our evaluation that he recalled seeing people bleeding at some point and that they were laying somewhere and there was blood and – on a porch and that he was afraid.

Q: Where in your report is that?

A: I didn't include it in my report.

Q: Okay.

A: Because in my understanding things that are extremely prejudicial and don't have a lot of probative value I wouldn't have included.

Q: I'm sorry. You're telling the Court that this man told you that he remembers something about these murders and you didn't include that in your report?

A: He told me that he remembered feeling confused and that there was blood and that he ran and he was afraid.

8

Q: Is that documented somewhere?

A: No. It was just something that he mentioned to me.

Q: You're saying that he told you that he remembers a porch and bloody bodies when you're assessing him for sanity and you didn't include that in your report?

A: He made mention of recalling seeing blood and being afraid.

Q: Doctor, didn't you say in your report that he didn't remember anything about the murder? You reiterate that multiple times in this report, yes?

A: I said he does not recall what happened on the day

Q: But apparently he does?

A: He made a mention once to me about recalling seeing blood and being afraid.

Q: You don't think that that is relevant to your assessment of his sanity?

A: My understanding is that -- was that at the time I was evaluating his sanity and that information -- in my training I was taught information that is extremely prejudicial in a murder case, you know, you have to weigh the probative and prejudicial value when first a prosecutor has to meet the burden of proof.

Q: And during the course of that assessment you -- this defendant told you that he remembers this porch and these bloody bodies and you independently made the decision that you don't think that's relevant and shouldn't go into the report?

A: I was taught in my forensic fellowship that if a patient or evaluee discusses something that is extremely prejudicial to their case prior to the case being tried that you have to weigh the prejudicial versus probative value.

Q: I want to know on what authority you made that assumption that I get to pick and choose what's relevant in court and I'll put in that report what I think is relevant and

the judge should be considering. Who taught you that?

> A: What I was taught, for instance, if a defendant were to say that they murdered someone that I would not include that in my report because it's extremely -- basically it's trying the case and that's not -- that's not my purview."

¶ 26    Dr. Shima testified that she administered the Miller Forensic Assessment Test (M-FAST), which is used to screen for malingering psychosis, or mood disorders. Dr. Shima explained that malingering means exaggerating or feigning illness. She stated that Randle scored a two on the test and that the threshold for suggesting that the subject is malingering is six.

¶ 27    On cross-examination, Dr. Shima stated that she used her laptop instead of the test booklet to record her answers while administering the test, but admitted the test is supposed to be conducted using the test booklet. Dr. Shima acknowledged that according to one of Randle's answers on the test, she recorded a zero where his actual answer should have been awarded one point. Dr. Shima stated this discrepancy was due to Randle changing his answer and her recording a zero and not changing the response from true to false. Dr. Shima also stated certain questions within the measure contained multiple parts and that for those questions, she did not record Randle's answers for each part but instead only scored the question as a whole. Towards the end of the test, Dr. Shima stated she stopped recording Randle's true/false or yes/no answers and just recorded the score. When the test ended, she noted that Randle scored a two and he would need to score a six or higher to be suggestive of malingering. As a result, Dr. Shima did not move on to the scale scores to determine the type of malingering. On redirect, Dr. Shima stated that she followed all the instructions for the M-FAST except for recording the answers into the booklet.

¶ 28    The parties entered into a stipulation regarding the testimony of Jhene Cooper. Cooper

would testify that she was living with Randle in November 2018 at Yvonne's house. Cooper, Randle, and Yvonne had a good relationship. Two days before the shooting, Randle called Cooper and told her to come and get her belongings. The following day, he called her and wanted her to admit that she was cheating on him. Randle told her that someone had cut off his electronic monitoring ankle bracelet but, did not say who did it. Sometime between 1 and 1:45 a.m. on the morning of the shooting, Cooper went to Yvonne to speak with Randle. They sat on the couch talking about their relationship until 5:30 a.m. Although Randle again tried to get her to admit that she was cheating, they spoke calmly and did not argue.

¶ 29    The parties entered into a stipulation to admit video surveillance from different stores in the area of 67th and Halsted. After entering these stipulations, the defense rested.

¶ 30    The State called Dr. Christofer Cooper in rebuttal, who stated he was employed with Forensic Clinical Services since 2005 and has held the position of Assistant Director since 2017. He stated he has conducted at least 2,000 forensic examinations and has been qualified as an expert in the area of forensic psychology approximately 310 times. Dr. Cooper was qualified as an expert in the field of forensic psychology without objection.

¶ 31    Dr. Cooper testified that he reviewed police reports, video footage, ERI, body-worn camera footage, grand jury transcripts, a psychosocial history report, medical records, DCFS records, education records, and Dr. Shima's report in preparation for his interview with Randle. Dr. Cooper interviewed Randle on June 9, 2021, via Zoom.

¶ 32    During his assessment of Randle, the volume and rhythm of his speech were appropriate, he presented well, his responses were appropriate, and there was no indication of any acute symptoms. Randle was not prescribed any mood stabilizer, antidepressant, or antipsychotic medication, and Randle, by his own self-admission, stated he experienced no mood or psychotic

symptoms at the time of the assessment. Randle admitted that prior to his arrest, he smoked marijuana four times a day, every day, since he was 20 years old. Randle was able to understand questions, he was compliant with the evaluation, and his statements were coherent but sometimes vague. During the evaluation, Randle reliably relayed his past hospitalizations and diagnoses but could not provide examples when asked to describe his symptoms of bipolar disorder, mood disorder, or PTSD.

¶ 33    Dr. Cooper stated he asks defendants to provide their account of an alleged incident Because, in doing so, they will provide an explanation or account of the offense. While this can sometimes be incriminating, it is necessary to the evaluation and is done to determine their mental state regarding sanity at the time of the offense. Defendants are free to say they do not want to talk about the offense and he will end the exam. Dr. Cooper was never taught to conceal any statements regarding the incident and would never "cherry-pick" information that makes defendants look culpable or throw away information that would demonstrate their innocence. Dr. Cooper only asks these types of questions when conducting fitness evaluations because the individual's fitness is specifically important at the time of the offense.

¶ 34    When Dr. Cooper asked Randle what happened on the day he was arrested, Randle stated he recalled "nothing about it." Dr. Cooper stated that it is very rare for someone to have complete memory loss while experiencing psychotic episodes. Randle also told Dr. Cooper he did not remember having a gun at the time of the murders, but did state that he had a gun for protection because he was selling marijuana from his home. Dr. Cooper asked Randle if he was experiencing any psychological symptoms at the time of the murders, and Randle stated, "I don't know, I don't know, I don't know."

¶ 35    After his initial assessment, Dr. Cooper scheduled a time to administer the Minnesota

Multiphasic Personality Inventory 2 Restructured Form (MMPI-2-RF). Dr. Cooper thought this assessment was important because when he asked Randle about his symptoms, he did not describe any symptoms related to mood disorder, depression, mania, bipolar disorder, PTSD, or anxiety, and Randle denied any recent psychotic symptoms. Dr. Cooper stated this test would allow him to obtain objective data regarding Randle's symptoms. When Dr. Cooper scored the test, Randle's responses were so extreme that they invalidated the overall clinical scores, meaning that Randle overreported his symptoms so much that he received the highest score a person can receive on the test. While the validity scales were still able to be interpreted, the clinical scales were uninterpretable because Randle was overreporting to such an extreme level. Dr. Cooper stated that the MMPI-2-RF is not a malingering test, but the data he received demonstrated extreme over-reporting by Randle. That, along with his assessment of Randle, led him to the conclusion that Randle was malingering.

¶ 36 Dr. Cooper did not administer the M-FAST. He testified that he believed failing to administer the test in accordance with the instructions by using a computer instead of the booklet would render the overall results useless. Dr. Cooper noted Dr. Canelas's evaluation on November 23, 2018, who was the first psychiatrist to see Randle in jail after the incident. Randle refused to answer basic questions, such as date of birth and whether he slept. Randle was tearful when asked about his family, and during questioning became agitated and asked to leave the room. Dr. Canelas noted that Randle's speech was within normal limits and that his mood and affect were angry, depressed, tearful, dysphoric, and guarded. Dr. Canelas did not observe Randle to have any hallucinations and that his thought process appeared appropriate. Dr. Cooper also noted Dr. Advani's diagnosis on June 11, 2019, where he diagnosed Randle with differential adjustment disorder and cannabis abuse and only prescribed Prazosin to Randle. Dr. Advani

again made the same diagnosis on October 1, 2019, December 17, 2019, and February 26, 2020. Dr. Cooper explained that differential adjustment disorder is a mild diagnosis, meaning an individual is adjusting to a life event such as being arrested and charged with murder and losing family members. Dr. Cooper testified that this diagnosis was not a diagnosis of depression, bipolar disorder, or schizophrenia and that no psychiatrist or psychologist at Cermak Health Services diagnosed Randle with a psychotic or bipolar disorder. The only medication Randle was prescribed in the two-plus years prior to Dr. Cooper's evaluation was Prazosin, which is an antihypertensive medication that can be used to treat nightmares. Dr. Cooper testified that it is also highly unlikely for someone with bipolar disorder to not be taking antipsychotic medication for bipolar and not exhibit symptoms, especially in Cook County Jail, while facing charges for the murder of two family members, and undergoing extensive forensic examination.

¶ 37    Dr. Cooper also reviewed the ERI video from after Randle was arrested and stated he did not observe him exhibiting any psychotic or delusional symptoms. He testified that Randle's actions in the ERI room were goal-oriented and effective. For example, when Randle demanded to be removed from the ERI room but was not, he took off his shoes and threw them at the lights, causing them to break. This forced the officers to remove him from the room.

¶ 38    Dr. Cooper testified he did not believe Randle experienced a manic episode because that would be inconsistent with the hospital records from St. Bernard's emergency room the day before and five days before the murders, the nine hours of ERI video immediately after his arrest, and Dr. Cooper's review of the records from the psychiatrist at Cermak Health Services in the days following the offense. Dr. Cooper stated that in his clinical opinion, Randle was legally sane at the time of the alleged offense. Dr. Cooper diagnosed Randle with cannabis use disorder and malingering and ruled out antisocial personality disorder. Additionally, Dr.

Cooper stated that a diagnosis of bipolar disorder or manic episode is not tantamount to a finding of insanity. Instead, the mental illness must be sufficiently severe and must manifest at the time the alleged conduct occurred in order for it to qualify as insanity. The State rested in rebuttal.

¶ 39   Following argument, the trial court found Randle guilty on all counts. In its ruling, the trial court took note of the fact that Dr. Shima stated in her report that Randle did not recall what happened on the date of the offense. The trial court contrasted this with Dr. Shima's testimony during cross-examination, when she said that Randle did have some memory of the events of that day and relayed that Randle told her he remembered people and blood on the porch. The trial court also noted that Dr. Shima testified that, "when information that was extremely prejudicial in a murder case was provided she had to weigh the probative and prejudicial value of information before disclosing it. She went on to add that if a defendant said they murdered someone she wouldn't include it in her report." The trial court also took note of the discrepancy in the test Dr. Shima conducted, and stated based on the prior inconsistency in her testimony the trial court could not determine "what defendant really answered" during that test. In summation the trial court stated:

>   "Based on what happened during Dr. Shima's testimony, there is no need to go into Dr. Cooper's testimony. Unfortunately whether because of lack of experience, poor training, or a misunderstanding of the role of an expert witness, Dr. Shima was not reliable. As a result, the defense is unable to prove by clear and convincing evidence that, as a result of a mental illness or mental defect, that the defendant lacks the substantial capacity to appreciate the criminality of his conduct and their opinion that he should be found not guilty by reason of insanity. Therefore, there's a finding of guilty on all counts."

¶ 40     Following this ruling, the trial court denied Randle's motion for a new trial. The case proceeded to a sentencing hearing where, in a lengthy statement in allocution, Randle claimed that his trial counsel was ineffective and stated he needed a *Krankel* hearing because of Dr. Shima's testimony at trial. The trial court responded to Randle's statement as follows:

>  "You've raised the issue regarding your attorney who she hired as an expert. Miss Shima had been used in this building before. There had never been any issues. Your attorney was diligent in raising the issue of mental health in hiring an expert.
>
>  What happened on the stand could not have been foreseen by anyone because there was nothing in the report to indicate that [defense counsel] should not use her as a witness. Therefore, I do not think that a Krankel hearing is appropriate in this case. Is there anything else you want to say, Mr. Randle?"

¶ 41     Randle then asked for an explanation as to why he was found guilty. The trial court reminded Randle that it had already made its ruling on the record. The trial court again asked Randle if there was anything else he wanted to add before sentencing. Randle again requested to know why he was found guilty and opined it was because his counsel was ineffective. The court then sentenced Randle to mandatory life in prison. Randle's motion to reconsider his sentence was denied. Randle appealed.

¶ 42     On appeal, Randle argued that after he made a *pro se* request for a hearing under *People v. Krankel*, 102 Ill. 2d 181 (1984), based on counsel's ineffectiveness for retaining and calling Dr. Shima as an expert witness to support his insanity defense, the trial court did not conduct an adequate inquiry into his claim to determine what efforts counsel took to investigate, vet, and prepare Dr. Shima. Randle claimed that the court denied the request without asking counsel or Randle any questions, instead asserting that counsel could not have foreseen what happened

during Dr. Shima's cross-examination because "there was nothing in the report to indicate that [trial counsel] should not use her as a witness." Therefore, Randle claimed that we should remand this case for a proper *Krankel* inquiry.

¶ 43    In *People v. Randle*, 2024 IL App (1st) 221136-U, ¶ 48, we found that the trial court failed to make any inquiry into the underlying factual basis, if any, of Randle's posttrial claim of ineffective assistance under *Krankel*. Accordingly, we remanded this case to the trial court for a preliminary investigation into Randle's claims to determine whether the appointment of new counsel to effectively present his claims was appropriate and necessary. *Id.*

¶ 44    On remand, the trial court held a preliminary *Krankel* inquiry. The court questioned Randle's trial counsel, who stated that she became acquainted with Dr. Shima when Dr. Shima spoke at a training at the public defender's office on cases dealing with defendants found not guilty by reason of insanity. Defense counsel stated that she was impressed with Dr. Shima's presentation and spoke with Dr. Shima about hiring her on Randle's case. Defense counsel also hired Dr. Shima on four other cases she was working on. They worked on these cases simultaneously. Defense counsel stated that there were other attorneys in the public defender's office that also retained Dr. Shima. There were no concerns raised by her fellow colleagues regarding Dr. Shima and Dr. Shima was "generally regarded very highly." Defense counsel explained that Dr. Shima's resume was impressive, she worked at the University of Chicago, and she heard nothing about her that would raise concerns.

¶ 45    Defense counsel retained Dr. Shima to work on Randle's case on April 4, 2019, and they communicated frequently by email and over the phone about Randle's case. They had four "substantive phone calls" about Randle's case and then they spoke in person prior to Dr. Shima's testimony at trial. Defense counsel received Dr. Shima's report on December 16, 2020, and she

reviewed the report. Defense counsel was not concerned that Dr. Shima's report stated that the murder occurred in broad daylight on the porch, because she knew Antonio McDaniels was found on the porch before he was transported to the hospital, and Yvonne's body was found in the foyer of the building.

¶ 46    Defense counsel stated that she and her co-counsel met with Dr. Shima to prepare Dr. Shima for trial and discussed her report and her testimony. They also discussed Dr. Cooper's report on multiple occasions and what points they could use to cross-examine him. Defense counsel stated that nothing in her conversations with Randle or with Dr. Shima indicated that Randle remembered anything from the shooting. Regarding the M-FAST testing, defense counsel testified there was nothing in Dr. Shima's report that would suggest that the test was administered improperly. Defense counsel stated she relied on Dr. Shima as an expert and therefore, relied on her expertise regarding the administration and results of the M-FAST test because she "assumed that if she was administering a test, that she knew how to do that." There was nothing in Dr. Shima's report to indicate how the test was administered.

¶ 47    Randle was then allowed to question defense counsel. Randle asked why she did not know about the proper way to conduct an M-FAST test when the prosecutor was able to question Dr. Shima about the test. Defense counsel explained that she believed the State was made aware of the improper administration of the M-FAST test by their expert, Dr. Cooper. She further stated she did not have any professional training in how to administer psychological or psychiatric examinations. Defense counsel stated "[Dr. Shima's testimony] was unexpected" and "if [she] had reason to believe that she was going to testify that way, [she] would have made different choices." She agreed with the court that just because she retained an expert to evaluate a client, she had no obligation to use that expert at trial and then stated she did not use Dr. Shima in the

four other cases they worked on together. Randle concluded by saying, "I just feel we could have done a thorough more (sic) job with this lady. I don't think she was qualified to do her job." The case was continued for the court's ruling because the court wanted to "review all of the answers [from] today with the court file and the transcripts from trial."

¶ 48     On the next court date, the court held that "defendant's claim regarding ineffective assistance of counsel lack[ed] merit and his motion is denied." In its ruling, the trial court stated that it had reviewed notes from trial and noted that "Dr. Shima testified that prior to testifying in this case, she had testified in court on at least 30-plus prior occasions and had always been qualified as an expert." The court further stated that defense counsel "testified that there was nothing in either her preparation of Dr. Shima or her client that indicated that Mr. Randle remembered anything from the shooting." Additionally, the court noted that Dr. Shima's report regarding the M-FAST made no mention of how the test was administered. The court further noted that defense counsel stated she did not have any professional training in the administration of psychological or psychiatric exams, nothing in the report put her on notice the exam was improperly administered, and she relied on Dr. Shima's expert knowledge regarding the administration of the test. Finally, the court discussed the fact that defense counsel removed Dr. Shima from the other cases they worked on together, and knew she was not required to use Dr. Shima in Randle's case.

¶ 49     This appeal followed.

¶ 50                                    ANALYSIS

¶ 51     Randle argues that this court should remand this case for a second-stage *Krankel* proceeding and appoint new counsel where the record demonstrates possible neglect of his case by defense counsel. Specifically, Randle argues that the court's preliminary *Krankel* inquiry did

not clearly establish that trial counsel's failure to discover the fatal issues with Dr. Shima's opinion prior to trial was not due to possible neglect of the case.

¶ 52     A *Krankel* hearing should occur "when a defendant raises a *pro se* posttrial claim of ineffective assistance of trial counsel." *People v. Jolly*, 2014 IL 117142, ¶ 29. A *Krankel* hearing "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims" (*People v. Patrick*, 2011 IL 111666, ¶ 39) and "is intended to promote consideration of *pro se* ineffective assistance claims in the trial court and to limit issues on appeal" (*id*. ¶ 41). See *People v. Roddis*, 2020 IL 124352, ¶ 34.

¶ 53     When a defendant files a *pro se* posttrial motion alleging trial counsel's ineffectiveness, the court must conduct a preliminary inquiry to examine the factual basis of the claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). A preliminary *Krankel* hearing "should operate as a neutral and nonadversarial proceeding." *Jolly*, 2014 IL 117142, ¶ 38. The trial court is not automatically required to appoint new counsel to assist the defendant; rather, the court should first examine the factual basis of the defendant's claim. *Moore*, 207 Ill. 2d at 77-79. There are three ways in which a trial court may conduct its examination: (1) the court may ask trial counsel about the facts and circumstances related to the defendant's allegations; (2) the court may ask the defendant for more specific information; and (3) the court may rely on its knowledge of counsel's performance at trial and "the insufficiency of the defendant's allegations on their face." *Id*. However, "[t]here is no set format for how an initial inquiry into a defendant's *pro se* allegations of ineffective assistance of counsel should be conducted." *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 85. A court need not expressly state that it is conducting a *Krankel* inquiry. *People v. Short*, 2014 IL App (1st) 121262, ¶ 121.

¶ 54    If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. *Id*. However, new counsel should be appointed if the allegations show possible neglect of the case. *Id*. Newly appointed counsel can independently evaluate the *pro se* claim and avoid the conflict of interest that defendant's trial counsel would experience in trying to justify their actions contrary to the defendant's position. *Roddis*, 2020 IL 124352, ¶ 36.

¶ 55    Although we review *de novo* whether the trial court properly conducted a preliminary *Krankel* inquiry (*Roddis*, 2020 IL 124352, ¶ 33), where, as here, the trial court conducted the inquiry and ruled on the merits of the claim, we reverse only if the court's ruling was manifestly erroneous. *People v. Smith*, 2016 IL App (1st) 140039, ¶ 14. Manifest error is error that is clearly evident, plain, and indisputable. *People v. Morgan*, 212 Ill. 2d 148, 155 (2004).

¶ 56    To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's performance was deficient and (2) counsel's actions resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Under the first prong, a defendant must demonstrate that his attorney's performance fell below an objective standard of reasonableness. *Evans*, 209 Ill. 2d at 220. Under the second prong, prejudice is shown where there is a reasonable probability that the result would have been different but for counsel's alleged deficiency. *Id*. Failure to satisfy either prong of the Strickland test precludes a finding of ineffective assistance of counsel. *Strickland*, 466 U.S. at 697.

¶ 57    Here, the trial court's finding that defense counsel's representation was not ineffective was not manifestly erroneous. During the *Krankel* inquiry, the court asked defense counsel a series of questions. Defense counsel testified that she hired Dr. Shima as an expert in this case and other cases because she was impressed by Dr. Shima, Dr. Shima was "generally regarded

very highly" by her colleagues who never raised any concerns regarding her work, and Dr. Shima had previously been qualified as an expert in 30 cases. She stated that she communicated with Dr. Shima by email and telephone and met with her in person to prepare for trial. Nothing in these exchanges with Dr. Shima led her to believe that Randle remembered anything from the shooting. Furthermore, defense counsel stated that she was not concerned about the fact that Dr. Shima's report stated the murders occurred in broad daylight on the porch because McDaniels was found on the porch, and Yvonne's body was found just inside the door from the porch in the foyer of the building.

¶ 58    The record developed at the preliminary *Krankel* inquiry affirmatively showed that defense counsel's decision to retain and present Dr. Shima was the product of investigation, preparation, and reasonable professional judgment, not inattention or neglect. The record further established that defense counsel did not merely hire Dr. Shima and then fail to prepare a defense. Defense counsel testified that she retained Dr. Shima well before trial, communicated with her, reviewed her written report, and met with her in person with co-counsel to prepare for trial. Defense counsel could not have known that Dr. Shima would testify the way she did.

¶ 59    Considering the exchange in its entirety, the record shows that the trial court conducted an adequate inquiry into Randle's ineffectiveness allegations. After questioning defense counsel, allowing Randle to question her, and relying on its own observations of counsel's performance and the trial record, the court reasonably concluded that Randle's ineffective assistance claim lacked merit and the appointment of counsel was not necessary. The trial court's finding was not manifestly erroneous.

¶ 60                                  CONCLUSION

¶ 61    Based on the foregoing, we affirm the judgment of the trial court.

¶ 62    Affirmed.